## MARYLAND STATE FAIR AND AGRICULTURAL SOCIETY, INC. *v.* SUPERVISOR OF ASSESSMENTS OF BALTIMORE COUNTY

[No. 303, September Term, 1960.]

*Decided June 14, 1961.*

The cause was argued before BRUNE, C. J., and HENDER-SON, PRESCOTT, HORNEY and MARBURY, JJ.

*Richard W. Emory,* with whom were *Thomas P. Perkins, III, James H. Cook* and *Venable, Baetjer & Howard* on the brief, for the appellant.

*Lawrence F. Rodowsky, Assistant Attorney General,* with whom were *Thomas B. Finan, Attorney General, Johnson Bowie, County Solicitor of Baltimore County,* and *Walter Haile, Deputy County Solicitor,* on the brief, for the appellee.

PRESCOTT, J., delivered the opinion of the Court.

This is an appeal from an order of the Circuit Court of Baltimore County entered on December 7, 1960, reversing in part an order of the Maryland Tax Court by holding that Maryland State Fair and Agricultural Society, Inc. (herein-after sometimes called the "Society") must pay ordinary

(property) taxes for the year 1959 on that portion of its property used to conduct horse racing as a feature attraction of the Maryland State Fair.

The case originated in the Appeal Tax Court of Baltimore County which divided the Fair Grounds owned by the Society into what that court designated as "Exhibition Section" and "Race Track Section." The Appeal Tax Court held that the Society was exempt by the Code (1957 and 1960 Cum. Supp.), Article 81, Section 9 (7) and (8) from paying property taxes on the "Exhibition Section," but that it must pay taxes on land and improvements which that court listed in the "Race Track Section."

The Maryland Tax Court held that the Society is entitled to an exemption as to "all of the 83.410 acres of land [the acreage being stipulated] and improvements erected thereon owned by the Society at Timonium." This, of course, included both the "Exhibition Section" and the "Race Track Section."

The Circuit Court of Baltimore County affirmed the Maryland Tax Court in holding that the Society is a non-profit educational and charitable institution, exempt from property taxes under Article 81, Section 9 (7) and (8), but reversed the Maryland Tax Court in part by holding that the Society is taxable on most of the property which the Appeal Tax Court had listed under the designation "Race Track Section." Under the decision of the Circuit Court, the Society must pay taxes for the year 1959 on 42.961 acres of the Fair Grounds and on certain improvements of which the grandstand, race track, bleachers, four stables and jockeys' quarters are the principal items. The record does not clearly show that the midway was included in this 42.961 acres, but we were informed during argument that it was.

The Society was organized in 1950 by a group of altruistic and public-spirited citizens to purchase the Fair Grounds and preserve the State Fair when the Maryland Jockey Club threatened to sell the property for use as an industrial site. A large number of citizens of Maryland subscribed to $600,000 in bonds to purchase the Fair Grounds for $500,000

and to provide $100,000 in working capital. The certificate of incorporation states the purposes to be:

> "the acquisition and operation of Maryland State Fair Grounds (known as Timonium Fair Grounds), Baltimore County, Maryland in the best interests of those engaged in agricultural, horticultural and related pursuits; the betterment of the conditions of those engaged in agricultural and horticultural pursuits, the improvement of the grade of their products, and the development of a higher degree of efficiency in their respective occupations; the conduct of a Maryland State Fair at Maryland State Fair Grounds to encourage the development of better agricultural and horticultural products through a system of awards; the education and instruction of those engaged in agricultural and horticultural pursuits; the conduct of such other entertainments, amusements, contests, horse shows, horse racing and trials of speed, expositions and other activities at Maryland State Fair Grounds as may aid and assist the aforesaid purposes; and any business or objects designed or calculated to aid, assist or achieve these purposes."

The Society has operated since 1950 in accordance with these declared purposes, and no dividend or distribution has ever been declared, or paid to stockholders. No director or officer has ever been paid any salary or other compensation, except the general manager, who is a year round employee.

The question for our determination is whether the Society's exemption from property taxes under Subsections (7) and and (8), mentioned above, applies to all of the land and improvements constituting the Maryland State Fair Grounds, or only a part thereof?

The appellee asserts that under the provisions of said Subsections 7 and 8 there are four elements in the test which the property of the appellant must meet before it qualifies for the privilege of exemption from taxation: (1) The property must be that of an educational or charitable institution, (2)

no part of the net income (with an exception not here pertinent) of the institution can inure to the benefit of any private shareholder or individual; (3) the property must be actually used by the educational or charitable institution; (4) and the use of the property must be reasonably necessary for the charitable or educational work of the institution. We agree.[1]

Appellee concedes that the appellant is either an "educational" or "charitable" institution, or both, compare 36 Op. A.G. 303, and that the appellant and the use of its property meet the requirements of (2) and (3); but the appellee earnestly contends that the use of that portion of appellant's property, ruled by the court below to be taxable, is not reasonably necessary for the charitable or educational work of the institution. Our question, therefore, narrows to this single contention.

In order to determine whether the use of the appellant's property is reasonably necessary for its educational and charitable purposes within the spirit, intent and wording of the legislature in enacting Subsections 7 and 8, it is necessary to consider the background and historic aspects of the Society's fairs, and of fairs in general. Fairs are events where people congregate to present and observe exhibitions that disclose how other people work, live and play; for the purpose of buying and selling live stock and commodities; for holding and participating in contests; and for pleasure and enjoyment. The word "fair" is derived from the Latin word *feria,* meaning a holiday or feast day, but fairs were held in many countries of the world long before the time of the Romans.

The very ancient fairs were connected with religious matters, but, even at that early date, they usually staged games and contests, the famous Olympic games being held at one of the fairs of Ancient Greece. As time wore on, "market" fairs were held, where commodities were bartered and sold, and thereafter came the "agricultural" fairs.

---

1. It is, therefore, unnecessary to set forth the provisions of these Subsections in detail. They provide for the exemption of certain property (not exceeding 100 acres) of charitable and educational institutions "necessary for the respective uses thereof." The quoted phrase is the crucial one in this decision.

The first one of this latter type to be held in this country was the Berkshire Cattle Show, about 1810. For the first time, women actively participated, sending in their pickles, jellies and other household goods, and receiving medals and prizes for the best. This type of fair became very popular throughout America, especially in the rural areas. Corn huskings, quilting bees, athletic contests, horse races, automobile races, and spectacular events were added to the programs, as time passed, for amusement, pleasure and instruction.[2]

After pointing out the many advantages accruing from the holding of agricultural fairs, 1 *Ency. Britannica,* pp. 418, 419 (1959 Ed.) has this to say:

"In its early years the agricultural fair was one of the main recreations available to farm families. The form that the recreational and amusement facilities should take has been debated since the beginning of fairs. Critics of the programs have charged that the amusements have overshadowed the exhibits. Early proponents of extensive recreational features replied that the farmer was entitled to relaxation and amusement, while during the 20th century the fair had to compete with many other means of recreation. Much controversy centered around the question of horse racing. This event grew steadily in popularity from its introduction as a feature of a few agricultural fairs in the 1830s, until by 1900 it had proved its importance as a permanent and colourful part of the annual program. By the mid-20th century the typical agricultural fair had an extensive entertainment program that appealed to urban and rural audiences alike.

"The modern county or state fair, with its permanent buildings devoted to farm produce, livestock, farm machinery, automobiles and handicraft, midway, horse and auto racing, dance pavilions, spectacular evening shows and fireworks, has something

---

2. For this background of fairs, see 6 The World Book Ency., pp. 9-12.

to appeal to every taste and yet still demonstrates agricultural progress and achievement.

\* \* \*

"The agricultural fairs and shows that survived until past the middle of the 20th century seemed well established and continued as a major force for a better agriculture, serving both the educational and recreational needs of the nation."

This brings us to the actual operation of the Society in conducting Maryland State Fairs at Timonium. The first fair at this location was held in about 1878, and as early as 1903 it became known as the Maryland State Fair, and is now officially designated as such. The evidence clearly shows that horse racing has been a traditional feature attraction of the Fair for many years. Newspaper articles as early as 1894 disclose "First-Class Racing This Year" as the main event of the Fair.

The Fair runs for approximately two weeks each year under the supervision of the Maryland State Farm Board— the first week being basically set aside for youth groups; the second for adults. A typical day at the Fair was described by the Society's president as beginning at 9:00 a.m. with 4-H (a national association of farm youth clubs, which teaches young people all phases of farm life) and F. F. A. (another national organization for instructing farm youths) dairy and livestock exhibits, and 4-H dairy cattle, livestock and egg-grading judging contests. These are followed throughout the day with exhibits of baked and canned foods, jellies, candies, clothing, needlework, arts and crafts and flower arrangements, etc. Some of the exhibits are entered by the Farm Bureau and State Grange, two national farm organizations for adults, by the University of Maryland Extension Service, and by the State Department of Forests and Parks. There are also demonstrations in meat cutting and cooking, in hand weaving, lace making, pottery making and other crafts. Horse races are held in the afternoon, except Sundays. The midway entertainment continues throughout the day, and in the evening the Farm Queen Dinner is held.

There was expert testimony tending to establish the many

beneficial practical results and the educational value of the overall operation of the Fair.

The horse racing is conducted on a one-half mile track under license from the State Racing Commission with pari-mutuel betting permitted. No races are held except during the Fair. Breeders are permitted to use the stables and the track, without charge, when the Fair is not in progress. The midway has the usual merry-go-round, Ferris wheel and other rides, bingo, wheel-of-fortune, hit-the-baby-doll and other games. And on each night during the Fair, a theatrical show is given in front of the grandstand.

All of the above activities are conducted on one tract of land (stipulated as consisting of some 83 acres), which is owned and operated by the Society as an integrated whole. The segregation into the "Exhibition" and "Race Track" sections was done by the Appeal Tax Court of Baltimore County. The land is improved by numerous fair and exhibition buildings, included among which is a large modern grandstand, completed in 1959 at a cost of about $1,000,000; and this building apparently is the cause of this litigation. The large investment in the grandstand was not initiated by officials of the Society, but was the result of a suggestion from the Racing Commission that the old grandstand would have to be replaced, if the Fair desired to continue high-class racing as an attraction. The grandstand is used for horse racing on twelve afternoons of the Fair, but it is also used for many other events during the Fair and at various times during the year. Each evening of the Fair, it is used for theatrical shows, horse-pulling contests or other entertainments. It is also used for the Farm Queen Dinner, for the crowning of the Farm Queen, for a 4-H parade, and parade of farm implements. In the mornings, it is sometimes used for demonstrations and 4-H activities. Between Fairs, the grandstand is used, without charge, for the Maryland Pony Show, thoroughbred yearling class show, cattle shows and other activities of a civic or agricultural nature.

The operation of the Maryland State Fair is financed by a grant from the State of Maryland and by revenues from a number of the activities conducted as a part of the Fair. For

the year 1959, the largest single source of revenue was the grant of $83,000 from the State, and the second largest source of revenue was the $77,380.16 in net income realized from horse racing. Other important sources of revenue were admissions at $58,494.50 and the midway at $31,500.

The precise question posed herein does not seem to have been decided by this Court, and there is a dearth of authority elsewhere directly in point. The case of *City of Lewiston v. All Maine Fair Ass'n*, 21 A. 2d 625 (Me.), involved property taxes on all of the property of the All Maine Fair, under a statute that exempted the property of literary and scientific institutions "occupied by them for their own purposes," but taxed "so much of the real estate of such corporations as is not occupied by them for their own purposes." The Fair Association owned a large tract of land upon which were a race track, grandstand, stables and numerous other buildings. It also owned other land, which it used for a skating rink, for ground rentals as lots upon which to erect cottages, and as a site of a "victualing" house. The argument in that case was quite similar to the contention in the instant one. The City of Lewiston claimed the association was not occupying the race track, grandstand and other buildings "for [its] own [literary or scientific] purposes." The Court held taxable the property not used by the Fair for its own purposes, and stated: "The land upon which the race track is laid out, the grandstand and the buildings used in connection with the operation of the annual Agricultural Fair, having been acquired and designed and always used in good faith for that purpose, are not taxable."

The liability, *vel non*, of the York County Agricultural Society for property taxes was involved in *York County Agricultural Society v. York County*, 179 Atl. 893 (Pa.). The facts and the statute involved therein were very much the same as in the *City of Lewiston* case, *supra*. The Agricultural Society owned some 100 acres, upon which it had laid out a race track and constructed a grandstand, stables and many other buildings, which had been used in the conduct of its Annual Fair for some years. It also had rented some of its property, including a miniature golf course, to strangers,

and this property was "not in any way associated with the charitable purposes" of the Society. The Court held that an injunction suit in equity would not lie; the proper remedy being an action at law. It stated, however, that the Society was entitled to an exemption on its property, including the race track, grandstand and stables, used for its annual Fairs, and that its property, which had been leased to strangers and not used for its charitable purposes, was taxable. During the course of its opinion, the Court stated that "property which is used directly for the purposes and in the operation of the charity is exempt, though it may also be used in a manner to yield some return, and thereby reduce the expenses."

In 36 Op. A. G. 303, the then Attorney General of Maryland and now Judge Hammond of this Court rendered an opinion (concerning an exemption under the retail sales tax) that the horse racing and other amusements at the Maryland State Fair were incidental to, and in aid of, the main purposes of the Society, and therefore did not detract from the "exclusively educational" nature of the Fair. And in Civil Action No. 7535 of the United States District Court for the District of Maryland, the Internal Revenue Service had issued a ruling that the Society was entitled to an exemption from federal income taxes on that portion of its operation which related strictly to exhibits, judging contests, etc., but that it was taxable on the "race meeting," as the race meeting was "an unrelated trade or business." A jury decided this issue adversely to the Internal Revenue Service, and since then the Society has not been required to pay any federal income tax on the net income from its racing.[3]

The appellee cites us no authority that directly supports

---

3. There are other judicial decisions holding fairs tax exempt, including the amusement features. Campbell v. Big Spring Cowboy Reunion, 210 F. 2d 143 (C.A. 5); Southeastern Fair Ass'n v. United States, 52 F. Supp. 219 (Ct. of Cl.); Oklahoma State Fair and Exposition v. Jones, 44 F. Supp. 630 (D.C. Okla.). None of these cases involved property taxes, but they recognize that entertainment, including horse racing, is an integral part of a fair and that a fair is educational and does not lose its tax exemption because of its entertainment features.

his position, but he names three previous decisions of this Court that he contends should be controlling: *Bullis School v. Appeal Tax Court,* 207 Md. 272, 114 A. 2d 41; *Morning Cheer, Inc. v. Board of County Com'rs,* 194 Md. 441, 71 A. 2d 255; and *Baltimore v. Grand Lodge of Masons,* 60 Md. 280. These decisions clearly state the Maryland law, but they are readily distinguishable from the case at bar.

In the *Bullis* case, a tax exempt school had purchased a 285 acre farm, situated seven miles from the school. Limited school uses of a portion of this tract were made by the taxpayer, and an exemption as to 34 acres had been granted. In 1953, the taxpayer sought an additional exemption for that portion of the farm which was used for farming, up to the 100 acre limitation. Agriculture was no part of the school's curriculum, and the school had been previously operated without a farm. The case turned upon whether the farm itself was reasonably necessary for the educational purposes of the school. Judge Henderson, for the Court, stated: "We cannot escape the conclusion that the whole purpose of the investment in the farm is to hold it as a site for the building of a new school in the indefinite future." The opinion pointed out that when an exemption is based upon "use," the use must be an existing one; and, as the primary purpose of buying the farm was to hold it for a future building site, the taxpayer had made "no showing of reasonable necessity," and therefore it was not entitled to the additional exemption.

*Morning Cheer, Inc., supra,* involved an exemption under Article 81, Section 9 (4), (then Section 7 [4]), relating to houses and buildings used exclusively for public worship and "the grounds appurtenant to such houses, buildings and parsonages and necessary for the respective uses thereof." Morning Cheer, Inc., a religious organization, purchased some 227 acres of land, all of which was woodland, except about 35 acres. The 35 acre parcel was developed as a place where members of the public could come and participate in a program of religious activities for a period of about ten weeks during the summer. Living facilities, including dormitories and cabins for sleeping, and meals were provided for the participants. A charge was made for board and lodging, but

no profit was realized. The improvements included a tabernacle, a lodge and about 15 to 20 cottages.

The taxes involved were for the year 1946. At that time Section 7 (7), (now Section 9 [7]), relating to "charitable and benevolent" institutions permitted an exemption, not to exceed 40 acres. The State Tax Commission and the trial court allowed, under the then Section 7 (4), an exemption of one acre, assessed at $40, on which the tabernacle stood, and the assessed value of the lot on which the residence used as a parsonage was located. Morning Cheer, Inc. claimed it was entitled to an exemption as a "charitable or benevolent" institution, and therefore Section 7 (7), now Section 9 (7), was applicable to it.

The Court held that "the primary objects for which the property of the appellant" was used was for religious purposes; consequently, it was only entitled to an exemption under Section 7 (4), but, as the 35 acres of cleared land were "clearly necessary for the use of the buildings and public worship, and the residence of the pastor," Morning Cheer, Inc. was entitled, under the statute, to an exemption of the 35 acres.

In *Baltimore v. Grand Lodge of Masons,* 60 Md. 280, the Grand Lodge owned a large building called "The Masonic Temple." It only used the upper portion of this building for the purposes of the lodge, and the lower portion was constructed into storerooms and halls, and as such was rented out and used, and the revenue derived therefrom was received and applied to the purposes of the association. The exemption at that time was to the buildings, equipment and furniture of charitable or benevolent institutions and "to the grounds appurtenant thereto, * * * which is necessary for the respective uses thereof."

The Court held that the statute, in the exemption granted, only contemplated such buildings or parts thereof as may be "reasonably necessary" for the corporate purposes of the institution; and, as the portion of the building rented out represented an investment for revenue, independent of and beside the actual corporate uses of the institution, it was legally liable for assessment and taxation.

We find nothing in these three cases that requires a holding in favor of the appellee; we think, as we shall soon point out, that they point up some of the situations in which the property of religious, educational and benevolent associations are subject to taxation: for example, when the property is not being used for, or fairly incidental to, the main purposes of the exempt association, or where the property is not being used for the primary purposes of the association and is commercially rented to others. It will be noted that in none of these cases was the property which was claimed to be exempt being used directly for the purposes and in the operation of the allegedly exempt institution.

In 2 *Cooley, Taxation,* § 686, Professor Cooley cites the *Grand Lodge* case, *supra,* as authority for the proposition that where the statute bases the exemption on the use of the property and the institution leases to others a part of its building or a separate building or a part of its land, or it receives an income from property otherwise used as a source of profit outside of and independent of its regular line of work, generally, the exemption does not apply to property rented out to others (other than a mere occasional renting out) by the exempt association or to other property held or used by it merely as a source of revenue. He then points out in §§ 683-685 that even if the exemption be based upon the use made of the property, it is not limited to property actually indispensable, unless the statute so expressly provides, but instead also includes property obviously appropriate and convenient to carry out the purposes of the exempt institution; and even where the exemption is based upon the property being "used exclusively" for exempt purposes, the general rule is that if the primary use to which the property is put is necessary for, or fairly incidental to, the main purposes of the exempt institution, it is immaterial that the property is used secondarily or incidentally for a purpose not embraced within the exemption.

In *Contributors to Pa. Hospital v. Delaware County,* 32 Atl. 456, 457, (Pa.) Mr. Justice Mitchell tersely and clearly marked the dividing line between those cases where the use of the property and the receipt of income therefrom deprive the institution of its exemption and the cases where they do

not, when he said: "Property which is not used directly for the purposes and in the operation of the charity, but for profit, is not exempt; and the devotion of the profit to the support of the charity will not alter this result. * * * But property which is used directly for the purposes and in the operation of the charity is exempt, though it may also be used in a manner to yield some return, and thereby reduce expenses."

There is one other principle of law that is involved herein. This Court has said many times (and Section 9 so provides with reference to exemptions thereunder) that tax-exemption statutes are to be strictly construed, but a strict construction permits a fair one, so as to effectuate the legislative intent and objectives, and it does not require that an unusual or unreasonable meaning be given to the words used in an exemption statute. *State Tax Comm. v. Standard Oil Co.*, 181 Md. 637, 640, 31 A. 2d 621; *State Tax Comm. v. Whitehall*, 214 Md. 316, 320, 135 A. 2d 298.

Applying the above principles of law to the facts of this case, we are drawn, inescapably, to the conclusion that all of the appellant's property comes within the legislative intent and objectives of Section 9 (7) and (8), so as to render it tax exempt. It is conceded to be, in its primary aims and goals, an educational institution. It has been determined by the former Attorney General of this State that it is "exclusively educational" in nature. It conducts the Maryland State Fair. Fairs, as we indicated above, are gala, festive events or carnivals, combining important educational features with amusements and attractions. Dr. Cairns, Dean of Agriculture at the University of Maryland, pointed this out when he testified: "Basically all fairs are created with * * * two objectives. The one is educational and the other is how to get the people there to show them what is educational and they have to have the traditional, * * * entertainment features associated therewith to help draw the crowds to those attractions."

Two of these traditional entertainment features of the Maryland State Fair, clearly established by the evidence, are the midway and horse racing, and the horse racing has been conducted in good faith as a part of the Fair for many years.

The Society is not a fly-by-night institution conducting the exhibits, demonstrations and competitions as a subterfuge to circumvent the payment of taxes on its horse racing activities, but it is composed of, as pointed out by Judge Hammond (36 Op. A. G. 304), "public spirited citizens whose interest was not profit but merely to save the State Fair for the benefit of Maryland farmers, breeders and those interested in the conservation of natural resources, as well as of the general public and the citizens of the State." The midway and horse racing features are an integral part and parcel of the Fair itself. They are not separate enterprises. The midway, horse racing and other activities of the Fair are truly hand-in-glove affairs. To attempt to operate the Fair without the midway or the horse racing would be, as Judge Markell remarked in one of his opinions, like putting on the play of "Hamlet," without the character, Hamlet. In other words, the land where the midway operates and where the horse racing is conducted (including the buildings thereon) is used directly for the purposes and in the operation of the Fair. It is not property used merely as a source of revenue. These facts, we think, clearly show that the uses of the land and buildings where the horse racing is conducted and the land used for the midway are reasonably necessary for the educational purposes of the Society, and we, therefore, hold that, under Section 9 (7) and (8), it is exempt from paying taxes thereon. That part of the order below which held the "Exhibit Section" to be tax exempt will be affirmed; that portion which held the "Race Track Section" to be taxable will be reversed.

Having reached this conclusion, it becomes unnecessary to determine the other question raised by the appellant.

*Order affirmed in part and reversed in part, and the case remanded for the entry of an order in conformity with this opinion, the appellee to pay the costs.*