SUPERVISOR OF ASSESSMENTS OF CARROLL
COUNTY *v.* PETER AND JOHN RADIO
FELLOWSHIP, INCORPORATED

* * *

PETER AND JOHN RADIO FELLOWSHIP, INCORPO-
RATED *v.* STATE DEPARTMENT OF ASSESS-
MENTS AND TAXATION

[No. 149, September Term, 1974.]

*Decided April 9, 1975.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*Ward B. Coe, III, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *K. Donald Proctor, Assistant Attorney General,* on the brief, for Supervisor of Assessments of Carroll County and State Department of Assessments and Taxation.

*Paul E. Burke, Jr.,* with whom were *W. Gibbs McKenney* and *McKenney, Thomsen & Burke* on the brief, for Peter and John Radio Fellowship, Inc.

SINGLEY, J., delivered the opinion of the Court. MURPHY, C. J., and SMITH, J., dissent in part and SMITH, J., filed a dissenting opinion in which MURPHY, C. J., concurs at page 366 *infra.*

In two appeals in one record, the Supervisor of Assessments of Carroll County (the Supervisor) and Peter and John Radio Fellowship, Incorporated (the Fellowship) each challenged a different order of the Maryland Tax Court. The Supervisor's complaint is that the Tax Court abated an assessment of $147,295.00 which had been imposed for the tax year ended 30 June 1971 on land and improvements owned by the Fellowship in Carroll County.[1] The

---

1. It would seem that the land and improvements had been used by the

Fellowship's unhappiness stems from the fact that in a second order, the Tax Court had affirmed an assessment, for State and City taxes, which had been imposed on the Fellowship's religious bookstore in Baltimore.

Before considering the facts of the cases and the contentions of the parties, we should note the somewhat limited scope of our appellate review of Tax Court orders. Prior to enactment of Chapter 385 of the Laws of 1971, effective 1 July 1971, Maryland Code (1957, 1969 Repl. Vol.) Art. 81, § 229 (l) and (m) provided for an appeal from an order of the Tax Court, in the first instance, to the circuit court of any county or to the Baltimore City Court, and for a further appeal to this Court.

Section 229 (l) provided for a determination of the case on the record of the Tax Court, and provided for an affirmance of the order unless "erroneous as a matter of law or unsupported by substantial evidence." When sections 229 (l) and (m) were repealed and reenacted in 1971, now codified as Code (1957, 1969 Repl. Vol., 1974 Cum. Supp.) Art. 81, § 229 (l), that section simply provided for an appeal to this Court from an order of the Tax Court.

As a consequence, appeals from the Tax Court are no longer governed by a review fixed by statute. Our cases have held that where no scope of review is thus provided, decisions of an administrative body will not be disturbed on appeal unless they are not supported by substantial evidence or are arbitrary, capricious or unreasonable, *Dickinson-Tidewater, Inc. v. Supervisor of Assessments*, 273 Md. 245, 255-56, 329 A. 2d 18, 24-25 (1974), citing *Heaps v. Cobb*, 185 Md. 372, 378-80, 45 A. 2d 73, 76 (1945).

We have imported into this test the question "whether a reasoning mind reasonably could have reached the factual conclusion the agency reached," *Dickinson-Tidewater, supra,* 273 Md. at 256, 329 A. 2d at 25; *Warlick v. Supervisor of Assessments*, 272 Md. 540, 545-46, 325 A. 2d 587, 590 (1974);

Fellowship for about 20 years before the first assessment was imposed for the tax year ended 30 June 1970. Through inadvertence, the Fellowship failed to make a timely protest.

*Fairchild Hiller v. Supervisor*, 267 Md. 519, 521, 298 A. 2d 148, 149 (1973).

The facts of these cases must be tested against this standard. The Fellowship is a Maryland corporation, incorporated in 1952. It has no power to issue stock and its activities are not conducted for profit. By charter it is empowered to broadcast religious programs and to conduct children's camps, bible camps and conference grounds. It has received an Internal Revenue ruling that it is exempt from federal taxation.

## Case No. 33

The first case involves the taxability of a tract of 472.562 acres owned by the Fellowship at Millers, in Carroll County, Maryland. About 13 acres, improved by some 30 buildings, comprise River Valley Ranch, operated as a nondenominational summer camp for children between the ages of seven and 19. The camp, which has a western frontier theme, functions for eight weeks each summer, and can accommodate about 200 campers, who pay a maximum of $35.00 per week. At times when the camp was not in session, other groups, all of them of a religious nature, except for the Carroll County Board of Education, which conducted a spring and fall outdoor educational program of a nonreligious nature, were permitted to use the facilities. All paid a fee, but the camp operated at a loss each year.

Of the remainder of the tract of about 460 acres, two parcels of about 369 acres and 84 acres were being farmed, primarily to raise hay and feed for the more than 40 horses and ponies owned by the camp. A noncontiguous tract of about five acres, bought to prevent encroachment, is wooded, but reached by a trail.

In keeping with the western theme there is a frontier jail, a stage depot, a stage coach, riding and hiking trails, one or two buffalo, a few articles of western attire available for purchase and a rodeo open to the public on Saturdays. Since Saturday is the day when one group of campers is replaced by another, attendance at the rodeo may be from 500 to

1,000 people. Other facilities include a swimming pool, a snack shop open on a limited basis, and picnic areas.

The Supervisor buttresses his case on the statutory exemption as it read at the time of the assessment, found in Code (1957, 1969 Repl. Vol.) Art. 81, § 9:

> "The following shall be exempt from assessment and from State, county and city taxation in this State, each and all of which exemptions shall be strictly construed:
>
> * * *
>
> "(4) *Churches, parsonages, etc.* — Houses and buildings used exclusively for public worship, and the furniture contained therein, and any parsonage used in connection therewith, and the grounds appurtenant to such houses, buildings and parsonages and necessary for the respective uses thereof."

Taking "houses and buildings used exclusively for public worship" and "grounds appurtenant to such houses [and] buildings . . . and necessary for the [use] thereof" as his text, the Supervisor argues that land devoted to farm or agricultural use, that lands purchased for future use or to prevent encroachment and that houses, buildings and grounds used as farmhouses, barns, storage sheds, dining halls, kitchens, dormitories, rodeo arenas, swimming pools, simply do not qualify as houses, buildings and grounds used exclusively for public worship.

The Tax Court found the answer in the testimony of John Osborne Bisset, the president of the Fellowship and founder and director of the camp, who explained its underlying philosophy:

> "[T]he total program is directed to one purpose; and that is to reach these young people for Jesus Christ, you see. And to do that, you can't just sit them in a church and preach from morning to night. There are many ways to attract young people. Now, referring to the folder that Mr. Derby [E. Stephen Derby, Special Assistant Attorney General]

displayed, if I may refer back, he noted specifically — and I want to enlighten Mr. Derby on that — there are no reverends or doctors or titles put in front of the names. We purposely did that, sir. We realized that young people are not running with glee to hear the Gospel or going to church. So with great subtlety, Your Honor, we called it River Valley Ranch because it is attractive. Boys and girls love cowboys and Indians. Even in Scotland where I was born, I loved cowboys and Indians, as I heard about them in America. And the attraction to these young people, we felt, was a subtle way, under God, to get these young people under the sound of God's Holy Word."

Turning to the 460 acres of fields and woodland, Mr. Bisset said:

"Now, let me suggest, sir — the mention is made about the tilled land. Being a Scotsman, naturally we felt — we used to buy hay, and we found it was utterly financially impossible; so we figured that to be self-sustaining in an operation, we prayed and asked God to send us a good dedicated Christian farmer, which we now have, who gets a very small salary. And we raise hay and crops to feed the animals on which the boys and girls ride. And that's the whole program of our farming — nothing more, nothing less. It's a revolving program around the camp program of reaching these kids for the Lord. Now, if we didn't have the feed, we couldn't have the horses; and if we didn't have the horses, most of the youngsters would never come to River Valley Ranch, sir . . . ."

\* \* \*

"Q. Is there any part of the property or facilities of the River Valley Ranch that are not used in conjunction with the operation of this Christian Bible camp? A. No, sir.

"Q. What is the purpose of having such substantial acreage? You have four or five hundred acres up there for this camp, whereas the actual campgrounds themselves, I take it, are somewhat smaller. A. Well, Mr. Burke, first of all, we can thank God that we have the 500 acres the way people are moving in. We are almost like Baltimore suburbs now with the growth. So that we are glad we have an acreage that gives the atmosphere to the children coming out of the City of being on vacation. But that is not the point. You are asking whether we use all of this and what's the purpose of having so much. You could not have trail rides. Some of this we do use as part of the farming land to feed the horses. We keep our own and raise our own horses because we found it was far too expensive and too dangerous to go out and buy horses each year. So we do this for one purpose, and that is to use the horses and the farming facilities for the camp program."

Mr. Bisset also described a typical day at the camp:

"So during the day we start out having breakfast. The bell rings, and we go down to the dining hall. I offer thanks, and we have breakfast. Then one of the main counselors will get up, and he has a verse for the week — a Bible verse — and the youngsters are supposed to learn that verse throughout the day. He gives it to them each morning at the dining room — at the breakfast table in the dining room facilities.

"Then we are moved out into the camp building areas where a planned program of clean-up goes on. The youngsters go into their bunk houses and we have a clean-up.

"After that we have what we call a quiet time when the youngsters will either read the Bible or sit on the porch or on the bed and discuss whatever they want to discuss.

"Then at 9:30 the chapel bell rings and we go over to the Old Town Meeting House and have our Bible instruction. After this we have a line-up — that is the facilities are lined up with a regular program throughout the day of horseback riding, swimming. We have the regular sports activities which you would have at any camp. In the meanwhile, our counselors who come from various schools and universities and colleges and Bible schools — they are given a week or two orientation before this to always be alert whether it is on a horse or whether it is swimming, whether it is some sports event, to try and capture that boy and girl for Jesus Christ, Your Honor, because this is our central purpose. They may pull him out of a game, a boy or a girl who has a concern, or who is a burdened child — and there are many burdened kids in our day and age — and we have the joy of seeing many young people come to Christ — not in a regular religious service, per se, but on the trail, at the swimming pool, or as we have our activities.

"We then have — I am a prophetic Bible teacher — and I this year gave in the barn special prophetic Bible lessons from the book of Daniel and from Revelations on the Second Coming of Jesus Christ, for we believe He is coming again to straighten out this old world. Well, any how, the marvelous teaching of the prophetic truth has so gripped our youth; and there was such a demand for it, a clamor for a class in the barn every day, which I just couldn't do physically — But I want to point out, sir, that the hunger and desire of these young people is created as a result of an atmosphere that lends itself to spiritual need. And in meeting that need, we use the various facilities that we have set up — bales of hay and straw, and had a rough kind of a church, you know, chapel set-up. And I taught these youngsters right through the summer months. And we do it other ways, also.

"Then we have supper. After supper we have a quiet time; and then there's the evening get-together at the chapel time when we have our speakers who are invited. They will give Bible expositions and give the Gospel.

"Then after the evening get-together which is from 8:00 to 9:00, we have a snack time."

* * *

"After that, the bell rings, which is time to shut down for the night; and the counselors take the young people in the cabins and we have what we call an evening devotional time in all the cabins, the Word of God is read, and these children are counseled and prayed with. And that goes on each evening in each cabin at the Junior and Teen Ranch."

Albert Irving Dasburg, a minister who had rented the camp for a week in each of six summers for use by a group from his church, was asked about the use of the property:

"Q Can you tell us where religious services are conducted in the camp other than in the tabernacle itself?

"A That is a very fundamental question. I am glad you asked it. The answer to that is: everywhere. And I don't mean to be totally comprehensive by saying that, but in reality, we are teaching young people in the tabernacle, we are teaching them on the campgrounds — I can think of many conversations I have had with young people sitting under a tree out in one of the fields nearby the tabernacle. I can think of countless conversations down by the swimming pool, leaning against the split-rail fence there, and sharing Christ and answer questions with young people — a definite form of instruction. I can think of moments when we took them out on the trails and paused and shared Christ with them there. I would say that every single part of that campground has been

used to share the Gospel of Jesus Christ with young people. As a matter of fact — just something that might be of interest — this past year we were — had to leave the camp rather early because of the flood that came. However, there was some very serious thought given to even a baptismal service in the pool of that camp that we might have conducted either Friday afternoon or early Saturday morning. There was very serious thought given to that. So if you say that just the chapel is the only place where religious services are conducted it would be definitely a wrong conclusion to reach.

"Q To your knowledge, sir, are the camp facilities used for anything other than religious purposes?

"A I have never known them to be used for anything but for religious purposes."

In its memorandum of grounds for decision, the Tax Court said:

"The evidence which required two separate hearing days to complete, was followed by the filing of extensive briefs on behalf of both the Petitioner and the Respondent. It indicated that the River Valley Ranch, by which the real estate in these proceedings is known, is a non-denominational Christian Religious Summer Bible Camp. The property is comprised of 472.562 acres of contiguous woods and farm land improved by various buildings designed to create the atmosphere of a Western Ranch and Town. Numerous photographs and plats were introduced on behalf of the Petitioner and the Respondent. The testimony showed that most of the buildings serve dual or multiple functions in the operation of the camp and its activities. For example, both the jail and the stage depot are used as dormitories; the barns are used not only to store hay and feed for the horses used in connection with the camp, but more importantly, as places of religious worship and for religious instruction; the

dining hall is also used as a chapel, and the swimming pool provides not only recreation but is likewise used for religious purposes. The entire property is used for trail rides and hikes and provides the setting for planned and spontaneous religious activities. Corn and hay are raised on the property to feed the livestock used in the operation of the camp and to contribute to the overall working ranch atmosphere. No crops or other agricultural products are sold."

In granting the exemption on these facts, it seems to us that the Tax Court met the test that there must be substantial evidence to sustain its findings, particularly when Mr. Bisset's uncontradicted testimony that the land and buildings were used for no purpose other than that of the camp is taken into account.

We regard the result reached in this case as but a logical extension of that in *Morning Cheer, Inc. v. County Comm'rs*, 194 Md. 441, 71 A. 2d 255 (1950). There, Morning Cheer, Inc., a nonprofit corporation of the Commonwealth of Pennsylvania, organized primarily for the purpose of sponsoring religious radio broadcasts, purchased a tract of 227.25 acres in Cecil County, Maryland, all but 35 acres of which were woodland. A tabernacle, a lodge containing a living room, dining room and bedrooms, and 15 or 20 cottages were built. The property was used solely for bible conferences of 10 weeks' duration in summer. The program consisted of religious broadcasts and bible study from 7:00 a.m. to 1:00 p.m., an afternoon of recreation and a religious service of an hour or more in the evening.

Morning Cheer contended its property was exempt from tax because it was a charitable or benevolent corporation. Our predecessors held that the primary use to which the property was put was for public worship, and that the buildings and the 35 cleared acres were therefore entitled to the exemption granted by the predecessor of Art. 81, § 9 (4), because this was the area used for bible study. To extend this rationale to 462 acres in the instant case, when there is testimony that the entire area is devoted to bible study and

the religious experience is continued while riding, hiking, camping, is fully compatible with *Morning Cheer.*

Nor are we persuaded that *Bullis School v. Appeal Tax Court,* 207 Md. 272, 114 A. 2d 41 (1955), relied on by the Supervisor, mandates a contrary result. There a nonprofit boys' preparatory school located in Silver Spring purchased a 285-acre farm some seven miles distant, where it hoped ultimately to relocate. Meanwhile, crops raised on the farm were used to feed 180 hogs and 80 cattle, which provided all of the pork and most of the beef used at the school. The predecessor of Art. 81, § 9 (8) exempted from taxation the buildings of nonprofit educational institutions and land "not exceeding (outside of any city) one hundred acres in area, appurtenant thereto, and necessary for the [use] thereof." Bullis School sought an exemption of 100 of the farm's 285 acres. Our predecessors affirmed a court order upholding an order of the Appeal Tax Court denying the exemption on the ground that the farm was neither appurtenant nor necessary to the school. The Court correctly recognized that the result in *Bullis* was not that dictated by *Morning Cheer, Inc. v. County Comm'rs, supra.*

Also inapposite is *Ballard v. Supervisor of Assessments,* 269 Md. 397, 306 A. 2d 506 (1973), where we affirmed an order of the Tax Court upholding an assessment on a residence for which an exemption had been sought under Code (1957, 1969 Repl. Vol.) Art. 81, § 9 (4). We noted that the building used as a residence by a minister, where a regular weekly service attended by five to fifteen people was held, also served as the site of his varied commercial enterprises. The minister regularly spent three to four hours each day conducting a mail forwarding business from this location. We based our conclusion on our determination that the residence was neither a house "used exclusively for public worship" nor "a parsonage used in connection therewith." We pointed out that we recognized that most modern churches carry on a program of secular activities, *Murray v. Comptroller,* 241 Md. 383, 401, 216 A. 2d 897, 907, *cert. denied,* 385 U. S. 816 (1966), and reaffirmed the teaching of *Morning Cheer, Inc. v. County Comm'rs, supra,*

194 Md. 441, that the exemption may be availed of for houses and buildings used *primarily* for public worship, *see also Maryland State Fair v. Supervisor,* 225 Md. 574, 587, 172 A. 2d 132, 137-38 (1961). Unlike the situation in *Ballard* where the religious and commercial uses of the property were clearly defined, at the River Valley Ranch we find the facilities comprising the camp and the program of religious worship and instruction inseparable because of the philosophy underlying the activities.

### Case TP-C No. 374

In the second case, the Fellowship would have us reverse an order of the Tax Court which affirmed an assessment for the tax year ended 30 June 1972 imposed by the State Department of Assessments and Taxation (the Department) on tangible personal property at the Trustworthy Peter and John Bookstore (the Bookstore) located at 519 North Howard Street in Baltimore.

The Fellowship has abandoned its contention made before the Tax Court that the basis of a tax exemption for the Bookstore may be found within subsection 9 (4) or 9 (8) of Code Art. 81 and now relies solely on subsection 9 (7): [2]

> "Although the primary purpose of the Trustworthy ministry is the spread of religion, it is not a recognized form of religious worship . . . and therefore, its tax exemption should be on the basis of its charitable purposes under Sec. 9 (7) of Art. 81." Brief for Appellee and Cross-Appellant at 19.

In support of its contention, the Fellowship produced evidence that the Bookstore was not operated for profit; [3] that it was regarded as but an extension of the broadcast ministry since it stocked and sold only such books and records as were doctrinally acceptable to fundamentalists;

---

2. At the time of the assessment, Maryland Code (1957, 1969 Repl. Vol.) Art. 81, § 9 (7) in pertinent part exempted "[b]uildings and the ground not exceeding one hundred acres in area appurtenant thereto, equipment and furniture used exclusively for hospitals, asylums, charitable, fraternal or benevolent institutions or organizations . . . ."

3. It had incurred operating deficits in every year it was in operation from 1966 to 1970, except for the year 1967, when it made a profit.

that it counseled those entering the store; that it sold religious literature at times below cost, and at times distributed it without charge.

The inventory of the Bookstore does not plainly fall within the purview of § 9 (7) as being "equipment and furniture used exclusively for . . . charitable . . . institutions or organizations." To say that the tangible personalty, even if it were the type of property contemplated by this statute, was used exclusively for charitable purposes would be to close our eyes to reality, *Berean Fundamental Church Council, Inc. v. Board of Equalization*, 186 Neb. 431, 434-35, 183 N.W.2d 750, 753 (1971).

The Tax Court concluded that the Bookstore was in competition with other church related bookstores, all of which are subject to personal property taxes, and that its operation was "more commercial than religious, charitable or educational."

The findings of the Tax Court being supported by substantial evidence were neither arbitrary, capricious nor unreasonable and the order denying the exemption will therefore be affirmed.

> *Orders of Maryland Tax Court in Case No. 33 and in Case TP-C No. 374 affirmed; cost in each case to be paid by appellant.*

*Smith, J., dissenting:*

I respectfully dissent from that portion of the majority opinion which holds approximately 460 acres of farmland and woodland in Case No. 33 to be exempt from taxation.

It seems to me that *Morning Cheer v. Co. Com'rs*, 194 Md. 441, 71 A. 2d 255 (1950), stretches to its outer limits the exemption here under consideration. The provision in Maryland Code (1957, 1969 Repl. Vol.) Art. 81, § 9, that the exemptions there set forth "shall be strictly construed" is a statutory enactment of the statement by our predecessors in *Co. Comm'rs v. Sisters of St. Joseph*, 48 Md. 34, 40 (1878), that "[o]ne of the fundamental rules of construction of legislative Acts relating to taxation is, that 'nothing is more

conclusively established, as well by the decisions of the Supreme Court of the United States as by those of Maryland and of other judicial tribunals, than that the right of taxation is never to be presumed to be surrendered by the sovereign power, and that such surrender is never made, unless it be the result of express terms or necessary inference.' *Baltimore v. R. R. Co.,* 6 Gill [288, 292 (1848)]; Cooley on Taxation, 146."

I am just unable to comprehend how approximately 460 acres of farmland and woodland can be said to be "grounds appurtenant . . . and necessary" for "buildings used exclusively for public worship" as those terms are normally understood by average individuals. We have said many, many times that the cardinal rule of statutory construction is to ascertain and carry out the real legislative intent and in ascertaining that intent the Court considers the language of a statute in its usual and ordinary meaning. *Md.-Nat'l Cap. P. & P. v. Rockville,* 272 Md. 550, 556, 325 A. 2d 748 (1974); *City of Gaithersburg v. Mont. Co.,* 271 Md. 505, 511, 318 A. 2d 509 (1974); *Grosvenor v. Supervisor of Assess.,* 271 Md. 232, 237-38, 315 A. 2d 758 (1974); *Radio Com., Inc. v. Public Serv. Comm'n,* 271 Md. 82, 93, 314 A. 2d 118 (1974); *Scoville Serv., Inc. v. Comptroller,* 269 Md. 390, 393, 306 A. 2d 534 (1973); *Silberman v. Jacobs,* 259 Md. 1, 267 A. 2d 209 (1970); and *Atlantic, Gulf v. Dep't of Assess. & T.,* 252 Md. 173, 249 A. 2d 180 (1969), to mention but a few of our holdings.

I do not know just when the present language came into the Code exempting from taxation "[h]ouses and buildings used exclusively for public worship . . . and the grounds appurtenant to such . . . buildings . . . and necessary for the respective uses thereof," but this exact language is to be found at least as far back as Code (1939) Art. 81, § 7. Thus, we know that it was enacted before the 1948 amendment to the Maryland Declaration of Rights, Art. 38. Prior to that amendment it was necessary to obtain the consent of the Legislature for a "gift, sale or devise of land . . . to any Religious Sect, Order or Denomination" other than for "any sale, gift, lease or devise of any quantity of land, not exceeding five acres, for a church, meeting-house, or other house of worship . . . ." Since the present Code (1957, 1969

Repl. Vol.) Art. 81, § 9 (4) here under consideration was enacted prior to 1948, I feel morally certain that the General Assembly at the time of its enactment did not contemplate an exemption from taxation of a tract of this size as connected with "buildings used exclusively for public worship." Moreover, I feel morally certain that the General Assembly since that time has not contemplated that a tract of land more than ten times the size of that exempted in *Morning Cheer*, decided after the 1948 amendment, would be exempted from taxation as necessary for "buildings used exclusively for public worship." Therefore, I conclude that the administrative agency, the Maryland Tax Court, erred as a matter of law.

Chief Judge Murphy authorizes me to say that he concurs in the views here expressed.