702 A.2d 690

STATE DEPARTMENT OF ASSESSMENTS AND TAXATION

v.

The MARYLAND–NATIONAL CAPITAL PARK
AND PLANNING COMMISSION.

No. 92, Sept. Term, 1996.

Court of Appeals of Maryland.

Nov. 14, 1997.

**4**

David M. Lyon, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen.; Jeffrey G. Comen, Asst. Atty. Gen., on brief), Baltimore, for Petitioner.

Isaac H. Marks, Acting Gen. Counsel (Debra Yerg Daniel, Associate Gen. Counsel, on brief), Upper Marlboro, for Respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI,* RAKER and WILNER, JJ.

BELL, Chief Judge.

██ The issue this case presents is whether the privately owned 94th Aero Squadron Restaurant (the "Restaurant"), which leases public land, adjacent to a public airport and park, is a "concession," within the meaning of Maryland Code (1957, 1994 Repl.Vol.), § 7–211(b)[1] of the Tax–Property Article,[2] where its primary customers are not patrons of the airport and park and the respondent, the Maryland–National Capital Park and Planning Commission (hereafter "Commission"), an

---

* Karwacki, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and the adoption of this opinion.

**1.** (b) *Public use.*—*An interest of a person in property of the federal government, the State, a county, or a municipal corporation is not subject to property tax, if the property is used for a concession that:*

 (1) *is located in a public airport, park, market, or fairground; and*

 (2) *is available for use by the general public.*

**2.** All code references will be to the Tax–Property Article unless otherwise indicated.

agency authorized to award such a concession[3], has retained little control over the restaurant's day to day operations. The Maryland Tax Court held that it was not and, after the Circuit Court for Prince George's County had affirmed, the Court of

---

3. Maryland Code (1957, 1993 Repl.Vol.) Art. 28, § 5–110, (Maryland–National Capital Park and Planning Commission) (Title 5, Property; Powers; Recreation Program; Subtitle 1, Metropolitan District Property and Powers Generally):

 The Commission may (1) lease for a term not exceeding 40 years and renew the lease from time to time for additional terms not exceeding ten years each, to any responsible individual, partnership or corporation, any portion of the lands within the metropolitan district, acquired for park purposes under any of the provisions of this article. The Commission may not enter into any lease agreement in excess of 20 years duration without the prior approval of the provisions of the lease by legislative enactment of the county in which the lease property is located in whole or in part. Further, all such lease agreements shall contain provisions for reversion without cost to the Commission of the property and its improvements regardless of whether the improvements were added to the property by the lessee during the term of the lease or any extension of the lease; and/or (2) grant privileges, permits, and/or concessions, and/or enter into contracts relating to the same, with any responsible individual, partnership, or corporation, to engage in any business or enterprise on lands acquired for park purposes within the metropolitan district under any of the provisions of this article; all on terms and conditions the Commission deems advantageous to the development of the park system as a part of the plan for the physical development of the metropolitan district and the plan of the Maryland–Washington Regional District within the metropolitan district. The purpose for which the property is leased, and/or the privileges, permits, and/or concessions are granted, may not be inconsistent with the use of the property for park purposes. Any lease and/or contract executed under the authority of this section shall contain a condition, stating specifically the purposes for which the property is leased, and/or the privilege, permit, or concession is granted. All agreements entered into by the Commission pursuant to this article shall contain provisions forbidding the assignment of the agreement without the consent of the Commission. This article may not be interpreted as a limitation on the Commission's authority to require in any agreement more restrictive provisions deemed by the Commission to be in the public interest. The provisions of this article may not be construed to validate any lease or agreement executed prior to July 1, 1972, which provides for an initial term beyond 20 years duration, nor to permit the renegotiation of any lease or agreement executed prior to July 1, 1972, for the purpose of extending the initial term of the lease beyond 20 years duration. This limitation does not apply to any lease with a nonprofit, service-oriented organization.

Special Appeals reversed. *Maryland–National Capital Park & Planning Comm'n v. State Dept. of Assess. and Tax.*, 110 Md.App. 677, 678 A.2d 602 (1996). We granted certiorari on the petition of the State Department of Assessments and Taxation, the petitioner. We shall affirm.

## I

In 1973, the Commission, an agency created by the General Assembly,[4] purchased the College Park Airport (hereafter "Airport"), a small airport located in Prince George's County and the world's oldest continuously operated airport. Also located on that site are a museum and a park. In an effort to enhance the attractiveness of the airport, museum, and park for their patrons, the Commission circulated, beginning in October 1980, a "prospectus;" its objective was to identify a business entity from the private sector, to which it could grant a concession "to construct, operate and maintain a restaurant concession at the College Park Airport." In addition to providing such relevant and important information such as the climate of the region, the location of the airport, the proposed terms[5] of the contract, and the concessionaire's fee, the

---

4. See Maryland Code (1957, 1993 Repl.Vol.) Art. 28, §§ 1–101 to 8–127 (1957, 1993 Repl.Vol.)

5. The prospectus contained terms which, if included in the lease agreement, would have given the Commission significant control day to day over the operations of the restaurant. The provision relating to the rates that could be charged to the public is an example:

> The Director of Parks and Recreation shall exercise the authority over rates charged with a reasonable opportunity for the concessionaire to realize a profit on these facilities and services as a whole, commensurate with the investment and obligation assumed. The concessionaire will prepare and submit to the Director of Parks and Recreation for approval a schedule of fees and prices to be charged for all goods or services offered for sale or hire on the premises. No charge will be made for any such goods, or services except in strict compliance with the approved schedule and any violation of this provision shall constitute grounds for the termination of the license and/or privilege herein granted. In approving rates, primary consideration will be given to the prices charged for similar facilities and services furnished or sold outside the areas administered by the Maryland–National Capital Park and Planning Commission under

prospectus stated that the Commission contemplated "a facility that would be sympathetic to the World War I era, and to the history of the College Park Airport." Also, it stated that "the terms of the concession contract under existing policies are to be commensurate with the size of the investment."

The only bidders on the project were 94th of College Park, Inc. and its parent company, Specialty Restaurant Corporation. Subsequently, 94th of College Park, Inc., entered into a twenty-year lease agreement with the Commission on May 1, 1981. That lease contained a provision by which the Commission

grant[ed] to Lessee for the period of said Lease (including any extension periods), the right to construct, operate, and maintain upon said Land the Improvements as herein defined in accordance with this Lease, provided the Lessee shall faithfully perform the terms and conditions of this Lease and Agreement. Lessor agrees not to grant the rights as herein granted to any other persons, nor will it construct and operate any financially competitive facility on the premises owned by it adjacent to the Leased Premises during the term of this Lease and Agreement, including any renewal period.

It also contained a provision which indemnified the lessee for the payment of any taxes it had to pay as a result of its interest in the leased premises: [6]

---

similar conditions with due regard being given to such other factors as may be deemed significant. The principal objective of such controls is to assure the public satisfactory service and quality merchandise at reasonable rates. The concessionaire will pay all expenses of promoting or operating the concession, including the payment of salaries of such personnel to provide for efficient operation, together with expenses for supplies and all public utility expenses. Neither this provision nor others reserving significant controls to the Commission was made a provision of the lease. Those omissions are relied upon by the appellee in support of his position.

6. While "all land or other property acquired by the Commission for the purposes specified [in Title 5 of Article 28], or any of them, shall be exempt from State, county, and municipal taxes," Art. 28, § 5-109(a), the rule is otherwise when a private entity has interests in government-

It is acknowledged by the parties hereto that, because the fee title to the Leased premises is owned by the Lessor, a public entity, the Leased Premises are not subject to either ad valorem taxation or possessory interest taxation against the leasehold. Accordingly, the aforesaid percentage rent schedule is structured in consideration of the tax-free status of the Leased Premises and that the Lessor and its assigns hereby indemnifies the Lessee and holds it harmless from any tax which may be assessed against either the fee title or the leasehold of the Lessee.

For its part, the lessee "agreed to operate, manage, and maintain ... in a good, courteous, and efficient manner a Restaurant (and the other improvements to be constructed by it in accordance with this Lease) and [to] operate, manage, and maintain the premises in a manner consistent with the purposes of this Lease and the public interest generally." Thus, it was required to submit, within five months after executing the lease, the final plans and specifications, as to the "design, character, and appearance" to the Commission for approval. Moreover, under the lease, the lessee's obligation was to pay the Commission a minimum annual rental payment of $18,000, in addition to a monthly percentage of gross revenue. Although the lease was with 94th of College Park, Inc., Specialty agreed to guarantee the lease and, in that capacity, assumed several responsibilities, among them, to provide a capital investment of approximately $900,000 to construct the restaurant and $100,000 in working capital.

---

owned property. As § 6–102(e) of the Tax–Property Article makes clear, unless otherwise exempted, such property is taxable:

(e) Interests in government property.—Unless exempted under § 7–211 or § 7–501 [public leasehold property—local exemptions] of this article, the interest or privilege of a person in property that is owned by the federal, the State, a county, or a municipal corporation government is subject to property tax as though the lessee or the user of the property were the owner of the property, if the property is leased or otherwise made available to that person:

(1) by the federal, the State, a county, or municipal corporation government; and

(2) with the privilege to use the property in connection with a business that is conducted for profit.

The 94th Aero Squadron Restaurant opened its doors in May 1986. It had, as it still does, a World War I aviation field motif, characterized by propellers hanging from the ceiling, numerous fireplaces, antiques, and other authentic French country decorations. On the regular menu, dishes range from $14.95 for the Chicken Moutarde to $21.50 for the Porterhouse Steak. Appetizers range from $4.50 for the onion straws, to the "Light Fare," like the Sante Fe chicken for $5.95. Headphones in the Restaurant permit the patrons to listen to communications between the pilots and the ground crew at the airport. In addition, there is a dance floor, along with a bar and a patio. The Restaurant sponsors specials, such as college night, catering to University of Maryland at College Park students, at which draft beer is sold for a dollar. Other specials include "Wild West Wednesday" and "Marco Polo Ladies' Night." There was testimony offered, albeit hearsay, that out of approximately ten thousand meals a month, at most one hundred of these meals were served to patrons of the airport park.

At the time the lease was executed, both the Commission and the lessee believed that the Restaurant was automatically tax-exempt because it was located on government property. Upon learning that they were mistaken, the Commission filed a request for exemption with the petitioner, the State Department of Assessments and Taxation (hereafter "SDAT").

The petitioner denied the Commission's request, concluding that the Restaurant was not a concession under § 7–211(b). The Commission successfully appealed this denial to the Property Tax Assessment Appeals Board ("PTAAB"), prompting the SDAT's appeal to the Maryland Tax Court ("Tax Court"). In the Tax Court, the parties stipulated that the Restaurant was, in fact, a "restaurant" and that it is located at a public airport and park. Following a hearing, the Tax Court reversed the PTAAB decision.

Having characterized the question before it as one of statutory construction and interpretation, the Tax Court construed "concession", as used in § 7–211(b), as follows:

I don't think that the word concession, as was used by the legislature there was meant from any other term other than a type of facility to be of service to the public under a given set of circumstances. In other words like a food concession stand or again as the *Friendship Hotel*[7] case spoke of, or the service stations that exist on I–95. . . . I think what the concession is running to [sic] is some type of food stand, or facility for servicing the public's needs in general who are using the area in question.

It further reasoned that, in order for the Restaurant to be "available for the general use of the public," in accordance with § 7–211(b), the General Assembly must have intended it to be a "facility that existed primarily for services in connection with the people who are using the airport and the people who are using the park, or the people who are using the market, or the people who are using the fairground. . . .And that's obviously not the situation here." The Tax Court, in essence, held that, to qualify as a concession and thus receive the benefits of tax-free status pursuant to § 7–211(b), the granting authority must have specific, detailed, operational controls over the concession, and the service provided must be primarily for the people using the airport, park, market or fairground to which the concession is adjacent.

The Commission timely sought judicial review in the Circuit Court for Prince George's County. Applying a three part test, namely, whether, in view of the fact that a lease agreement, in

---

7. *Friendship International Hotel Corporation v. Supervisor of Assessments of Anne Arundel County,* 1970 WL 584 (Md. Tax Court)(1970), was a tax case concerning the definition of a concession much as in the instant case. A privately funded hotel was constructed on public property very near the public airport. The government requested that this hotel be built to give the patrons of this airport somewhere to rest. Testimony revealed that 90% of the patrons of this hotel were airport users. The court held that, giving the word "concession" its ordinary and natural meaning, the hotel fit within the spirit and intent of the statute and should be exempt from taxation. The statute in question was Article 81, § 8(6)(e) of the Md.Code (1957, 1969 Repl.Vol.). Note the discussion of this statute and its relevance to 7–211(b) in *Maryland–National Capital Park & Planning Comm. v. Dept. of Assess. and Tax.,* 110 Md.App. 677, 690–92, 678 A.2d 602, 608–09 (1996).

and of itself, does not create a concession, there was more than a lease agreement to define the concession, whether the lessee has a specific obligation to maintain the services, which are the subject of the concession, including a requirement of minimum hours and specific standards of regular supervision, and whether the service is one customarily required in a park, airport, market, or fairground,[8] that court affirmed the decision of the Tax Court. Further, construing § 7–211(b), the court concluded that the phrase, "available for use by the general public," refers to those members of the general public who visit or use the airport or park facilities or otherwise are on that property for a reason other than dining at the Restaurant. Proceeding from that premise, it found that the patrons of the Restaurant were not members "of the general public."

The Commission appealed that judgment to the Court of Special Appeals. That court, noting the applicability of the plain meaning rule,[9] reversed. The intermediate appellate court held that the fundamental meaning of "concession" is "a grant of some right," *Md.–Nat Cap. P. & P. Comm'n,* 110 Md.App. at 697, 678 A.2d at 612, which "carries with it, by

---

8. In *Kent v. City of Grand Rapids,* 381 Mich. 640, 167 N.W.2d 287 (1969), the Michigan Supreme Court held that hangars on airport property used for aircraft storage, maintenance, and operation of a private flying school and the lease of airport property for motel and restaurant purposes were "concessions" within the applicable statute and, therefore, tax exempt. Similar to our own, the Michigan statute provided that otherwise exempt property was taxable when made available to and used by private individuals or entities in the conduct of a for profit business, "except where the use is by way of a concession in or relative to the use of a public airport ... or similar property which is available to the use of the general public...." One Justice dissented, offering a four prong test for determining whether a particular use is a concession. *Id.* 167 N.W.2d at 293. The circuit court relied on that opinion although it condensed the test from four prongs to three. *See also City of Detroit v. Tygard,* 381 Mich. 271, 161 N.W.2d 1, 3 (1968).

9. The predominant goal when construing statutes is to seek out legislative intent. The words actually used in the statute, and their "plain meaning" are the best indicator of that intent. See *Montgomery County v. Buckman,* 333 Md. 516, 523, 636 A.2d 448 (1994). *See also Harford County v. University,* 318 Md. 525, 529, 569 A.2d 649, 651 (1990), *NCR Corp. v. Comptroller,* 313 Md. 118, 124, 544 A.2d 764, 767 (1988); *Utt v. State,* 293 Md. 271, 286, 443 A.2d 582, 590 (1982).

implication, the power to grant or withhold the right and to determine the degree of exclusivity and control."*Id.* at 701, 678 A.2d at 613. The Court of Special Appeals thus concluded, *inter alia,* that the Commission granted the Restaurant a concession to construct and maintain a restaurant at the airport, and that the Commission had the power to decide the degree of exclusivity and control it would exercise over it.

## II

The SDAT argues that the Restaurant is not a concession. In support of that conclusion, it reiterates essentially the rationale adopted by the Tax Court and the circuit court: there isn't a functional, or other relationship between the Restaurant and the government property on which it is located and which it is intended to benefit; the Restaurant does not cater exclusively to the airport; and the Commission has little control of its day to day operations. It also complains about the Court of Special Appeals applying the plain meaning rule, maintaining that the plain meaning rule alone is not determinative, it being well settled that the meaning of even the plainest language is controlled by its context. (Citing *Kaczorowski v. Mayor and City Council of Baltimore,* 309 Md. 505, 514–16, 525 A.2d 628, 632 (1987)).

On the other hand, the Commission urges the plain meaning rule. Thus, it argues that giving the language of § 7–211(b) its natural and ordinary meaning produces a clear result, that reached by the Court of Special Appeals—the Commission granted the Restaurant a concession when they entered into the lease agreement.

## III

Section 7–211(b) provides:

(b) Public Use—An interest of a person in property of the federal government, the State, a county, or a municipal corporation is not subject to property tax, if the property is used for a concession that:

(1) is located in a public airport, park, market, or fairground; and

(2) is available for use by the general public.

To qualify for an exemption from the payment of property tax under § 7–211(b), a private "person" must have an "interest" in public property, as relevant to this case, property of the State, that is "used for a concession," and that is located in a "public airport, park, market, or fairground." The parties have stipulated that the Restaurant is located in a park that also contains a public airport. That leaves two questions to be resolved. The meaning of the term, "concession" as used in § 7–211(b) is one of them and, indeed, is at the heart of the controversy. The other is whether the concession is "available for use by the general public."

Both parties agree that a concession is "a grant of a right," but disagree as to the circumstances under which that grant occurs or that govern its applicability. Since the term has not been defined by the General Assembly, our task involves statutory construction. That is likewise true with respect to the meaning of the phrase "available for use by the general public."

The cardinal rule of statutory interpretation is to give effect to the legislative purpose or policy. *Tracey v. Tracey,* 328 Md. 380, 388, 614 A.2d 590, 594 (1992); *Privette v. State,* 320 Md. 738, 744–45, 580 A.2d 188, 191 (1990). To determine that purpose or policy, we look first to the language of the statute, giving it its natural and ordinary meaning. *Montgomery County v. Buckman,* 333 Md. 516, 523, 636 A.2d 448, 452 (1994). *See also Stapleford Hall Joint Venture v. Hyatt,* 330 Md. 388, 400, 624 A.2d 526, 531 (1993); *Taxiera v. Malkus,* 320 Md. 471, 480, 578 A.2d 761, 765 (1990); *Jones v. State* 311 Md. 398, 405, 535 A.2d 471, 474 (1988), *Brown v. State,* 285 Md. 469, 474, 403 A.2d 788 (1979).[10] We will not

---

10. *Brown v. State,* 285 Md. 469, 474, 403 A.2d 788, 791 (1979) held that where the General Assembly has chosen not to define a term used in a

resort to subtle or forced interpretations for the purpose of extending or limiting the operations of the statute. *Brown,* 285 Md. at 474, 403 A.2d at 791. *See also Schweitzer v. Brewer,* 280 Md. 430, 438, 374 A.2d 347 (1977); *Booth v. Campbell,* 37 Md. 522(1873); *Allen v. Mutual Fire Insurance Co.,* 2 Md. 111 (1852). Of course, the statute must be read in context, taking into account related statutes or a statutory scheme. *GEICO v. Insurance Comm'r,* 332 Md. 124, 132, 630 A.2d 713, 717 (1993). Moreover, in deciding what a term's ordinary and natural meaning is, we may, and often do, consult the dictionary.

The meaning of "concession" was before this Court in *Belvedere Hotel Co. v. Williams,* 137 Md. 665, 113 A. 335 (1921). In that case, Williams, the operator of a barber shop and manicuring concession in the hotel, brought an action against the hotel to enjoin it from, among other things, permitting another barber shop to be operated in the hotel, in violation of his rights under his lease with the hotel. Ruling in favor of Williams, the Court defined "concession" as the "grant" of some right or privilege:

> The use of the word "concession" in the lease, we think, shows an intent to convey more than a part of the premises. As stated by the appellee in his brief, the concession granted by the lease was the concession "in its hotel," and was clearly intended to be the concession of the privilege for the entire hotel.

> In Vol. 2, *Words and Phrases,* 1386, it is said: The English word, "concession" derived from the Latin word in its ordinary use, is exactly or nearly the equivalent of the word "grant," and the word "concessi" in a lease implies a covenant for quiet enjoyment.

*Id.* at 673, 113 A. at 337–338. This meaning of concession is confirmed by its definition as reported in several dictionaries we consulted.

---

statute, this court will give that term, in the first instance, its ordinary and natural meaning.

Webster's Third New International Dictionary defines a concession as

> a: a grant of land or other property esp. from a government in return for services rendered or proposed or for a particular use.
>
> b: a usually exclusive right to undertake and profit by a specified activity
>
> c: a lease of premises or a portion of premises for a particular purpose, esp. for some purpose supplementary to another activity, or for providing entertainment.

Black's Law Dictionary 289 (6th ed.1990) defines a concession as:

> A grant, ordinarily applied to the grant of specific privileges by a government. . . .

. Webster's New World Dictionary 129 (1983):

> a privilege granted by a government, company, etc. as the right to sell food at a park.

Webster's New Collegiate Dictionary 233 (1973):

> a grant of land or property esp. by a government in return for services or for a particular use. . . .

We believe this meaning to be equally applicable to "concession" as used in § 7–211(b). *See* also 46 *Opinions of the Att. Gen.*, 212, 215 (1961).

▮ As we have seen, the General Assembly has empowered the Commission to grant concessions and to do so "on terms and conditions the Commission deems advantageous to the development of the park system as a part of the Maryland–Washington Regional District within the metropolitan district," however, to the limitation that "the purpose for which the property is leased, and/or the privileges, permits, and/or concessions are granted, may not be inconsistent with the use of the property for park purposes." Art. 28, § 5–110. Moreover, as we have also seen, the Commission granted to the Restaurant "the right to construct, operate, and maintain upon said Land [a restaurant] as . . . defined in accordance with this Lease," conditioned on its faithful performance of the

lease terms and conditions and the Commission's agreement "not to grant the rights as herein granted to any other persons, nor will it construct and operate any financially competitive facility on the premises owned by it adjacent to the Leased Premises" during the lease term or any renewal period. Therefore, notwithstanding its failure to use the word, the meaning of which we have demonstrated is clear and unambiguous, what the Commission granted to the Restaurant in the lease patently is a concession. And a concession need not be exclusive. Indeed, as the intermediate appellate court pointed out, "[t]he General Assembly is cognizant that degrees or levels of control may be layered upon a "concession." " 110 Md.App. at 698, 678 A.2d at 612. For that proposition, it quoted Art. 23A, § 2A(d)(2)(1957, 1993 Repl.Vol.), which provides:

(2) Each municipal corporation shall have the authority to displace or limit competition by granting one or more franchises for any concession on, over or under property owned or leased by the municipality on an exclusive or nonexclusive basis, to control prices and rates for such franchises; to establish rules and regulations to govern the operation of the franchises, to provide for the enforcement of any such measure; and to lease or sublease publicly owned or leased land, improvements to land, or both on terms to be determined by the municipality without regard to any anticompetitive effect.

It is confirmed by the provision in Art. 28, § 5–110(2) which grants the Commission the discretion to grant concessions "on terms and conditions the Commission deems advantageous to the development of the park system as a part of the Maryland–Washington Regional District within the metropolitan district."

■ Turning to the next area of controversy, whether the concession "is available for use by the general public," the same analysis obtains. That language requires availability for, rather than actual, use by the general public. There simply is no evidence that the Restaurant was, or is, not available for use by the general public at all times; on the

contrary, all evidence presented at the hearing suggests otherwise. In fact, as the Court of Special Appeals observed: "testimony heard by the Tax Court established that the Restaurant was available to serve and served both patrons and non-patrons of the Calvert Road Park." *Id.* The SDAT argues that the Restaurant's availability to the public is determined by its primary use and that is, in turn, determined by calculating the number of persons for whom the primary purpose in frequenting the area was to use the park, and for whom the existence of the Restaurant provided an added incentive for doing so. Consequently, it concludes, a Restaurant is not available to the general public where the majority of its patrons come only to the Restaurant and do not avail themselves of the Park's attractions. We are not persuaded. Assuming the argument to be factually correct, it fails to give effect to the plain language of the statute; in fact, it reads into that language, a condition that, giving the language its natural and ordinary meaning, the Legislature neither imposed nor contemplated. The statute requires no more than that the concession be available to the general public. The SDAT would construe that provision to mean a particular segment of the public, *i.e.*, those who frequent or avail themselves of the attractions of the Park. We shall not so construe it.

■ To be sure, tax-exemption statutes are to be strictly construed, in favor of the taxing authority. Indeed, this Court has so stated on so many occasions as to be well settled. *E.g., Comptroller Of The Treasury v. Disclosure, Inc.*, 340 Md. 675, 683, 667 A.2d 910, 914 (1995); *Supervisor of Ass. v. Bosley*, 293 Md. 208, 212, 443 A.2d 91, 93–94 (1982); *Hearst Corp. v. State Dept. of Assessments & Tax.*, 269 Md. 625, 643, 308 A.2d 679, 688–689 (1973); *Perdue v. St. Dep't of Assess. & T.*, 264 Md. 228, 233, 286 A.2d 165, 167–168 (1972); *Maryland State Fair v. Supervisor*, 225 Md. 574, 588, 172 A.2d 132, 139 (1961); *State Tax Comm. v. Whitehall*, 214 Md. 316, 320, 135 A.2d 298, 300 (1957); *State Tax Comm. v. Standard Oil Co.*, 181 Md. 637, 640, 31 A.2d 621, 622 (1943).

But a strict construction does not preclude a fair one, *Maryland State Fair v. Supervisor*, 225 Md. 574, 588, 172 A.2d 132, 139 (1961). Rather, it still contemplates a construction that effectuates the legislative intent and objectives; "it does not require that an unusual or unreasonable meaning be given to the words used in an exemption statute." *Id.*; *Standard Oil Co.*, 181 Md. at 640, 31 A.2d at 622–623; *White-hall*, 214 Md. at 320, 135 A.2d. at 300. In other words,

> the rule of strict construction of tax exemptions does not call for strained or unreasonable construction to the extent of being adverse to the real legislative intention, for the judicial interpretation must always be in accordance with the actual meaning of the lawmaking power.

*Perdue Foods v. St. Dep't of A. & T.*, 264 Md. 672, 688, 288 A.2d 170, 179 (1972), quoting *Pittman v. Housing Authority*, 180 Md. 457, 460–61, 25 A.2d 466, 468 (1942). We agree with the Court of Special Appeals that "the legislative purpose [of § 7–211(b) is] to empower governmental bodies to encourage development of facilities for public use in parks, airports, markets, and fairgrounds." 110 Md.App. at 701, 678 A.2d at 614. That statute's plain language indicates, when viewed in context with Art. 28, § 5–110, that the Legislature intended to accomplish that purpose by exempting from tax those concessions, operated in parks, airports, markets, and fairgrounds, under a grant by the Commission, on conditions set by the Commission, and consistent with that statute's purpose, that are available for use by the general public. There is no dispute that the Restaurant is located in a park that also includes an airport. And, as we have seen, the Commission granted the Restaurant a concession to operate the Restaurant on park property, under conditions stated in the lease, during the term of the lease, and that the concession meets the availability criteria. To reach any other interpretation is to give the statute a forced and strained construction to achieve a result. As we have seen, however, that is not the office of strictly construing tax exemption statutes. *See Suburban Propane Gas Corp. v. Tawes*, 205 Md. 83, 87, 106 A.2d 119, 122 (1954), in which we stated:

Of course, tax exemption statutes are to be strictly construed in favor of the State. The taxing power is never presumed to be surrendered. Every assertion that it has been relinquished must, to be effective, be distinctly supported by clear and unambiguous legislative enactment. To doubt an exemption is to deny it. However, the tax exemption statute should not receive a strained or unreasonable construction that would defeat the purpose of the legislative enactment.

JUDGMENT AFFIRMED, WITH COSTS.