787 A.2d 824

**Lamont HAMWRIGHT**

v.

**STATE of Maryland.**

**No. 1958, Sept.Term, 2000.**

Court of Special Appeals of Maryland.

Dec. 31, 2001.

18

20

Michael R. Malloy, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for appellant.

Mary Ann Ince, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., both of Baltimore and Sandra A. O'Connor, State's Atty. for Baltimore County, Towson, on brief), for appellee.

Argued before SALMON, JAMES R. EYLER and KRAUSER, JJ.

SALMON, Judge.

Section 3–804(e) of the Courts and Judicial Proceedings article of the Maryland Code (1998 Repl. Vol.) reads, in pertinent part, as follows:

> *Limitations.*—The [juvenile] court does not have jurisdiction over:
>
> (1) A child at least 14 years old alleged to have done an act which, if committed by an adult, would be a crime punishable by death or life imprisonment, *as well as all other charges against the child arising out of the same incident,* unless an order removing the proceeding to the [juvenile] court has been filed under Article 27, § 594A of the Code.[1]

(Emphasis added.)

In this case, Lamont Hamwright, who was fifteen years old at all times here pertinent, was charged with two crimes that

---

1. Article 27, section 594A, reads:

were punishable by life imprisonment. Those crimes were first-degree sexual offense (Md. Ann.Code art. 27, § 464(b) (1996 Repl. Vol.)) and attempted first-degree sexual offense. (Art. 27, § 464(F).)

In addition, Hamwright was charged with a host of other crimes that were not punishable by either death or life imprisonment. The jurisdictional issue raised in this appeal, which

---

**Transfer of certain juvenile causes.**

(a) *Transfer to juvenile court.*—In any case, except as provided in subsection (b), involving a child who has reached 14 years of age but has not reached 18 years of age at the time of any alleged offense excluded under the provisions of § 3–804(e)(1), (4), or (5) of the Courts and Judicial Proceedings Article, the court exercising jurisdiction may transfer the case to the juvenile court if a waiver is believed to be in the interests of the child or society.

(b) *Non-transferable cases.*—The court may not transfer a case to the juvenile court under subsection (a) if:

(1) The child has previously been waived to juvenile court and adjudicated delinquent;

(2) The child was convicted in another unrelated case excluded from the jurisdiction of the juvenile court under § 3–804(e)(1) or (4) of the Courts and Judicial Proceedings Article; or

(3) The alleged offense is murder in the first degree and the accused child is 16 or 17 at the time the alleged offense was committed.

(c) *Determination as to waiver of jurisdiction.*—In making a determination as to waiver of jurisdiction the court shall consider the following:

(1) Age of child;

(2) Mental and physical condition of child;

(3) The child's amenability to treatment in any institution, facility, or program available to delinquents;

(4) The nature of the alleged offense; and

(5) The public safety.

(d) *Study concerning child.*—For the purpose of making its determination, the court may request that a study concerning the child, his family, his environment, and other matters relevant to the disposition of the case be made.

(e) *Procedures of juvenile court.*—If the jurisdiction is waived, the court may order the person held for trial under the regular procedures of the juvenile court.

(f) *Holding in juvenile facility.*—The court may order a minor to be held in a juvenile facility pending a determination under this section to waive jurisdiction over the case involving the minor to the juvenile court.

was not raised below,[2] is whether any of the eleven crimes for which Hamwright was convicted arose "out of the same incident" as did the charges of either first-degree sexual offense or attempted first-degree sexual offense. As appellant correctly argues, the trial court had no jurisdiction over any crime that did not arise "incident to" the sex offenses.

Appellant also raises four non-jurisdictional issues, *viz:*

1. Did the circuit court err by denying appellant's motion for separate trials on certain counts in the indictment?

2. Did the circuit court err by denying appellant's motion to suppress his self-incriminating statements on the ground that the statements were involuntary?

3. Did the circuit court err when it denied appellant's request for a "reverse waiver" from the circuit court to the juvenile court?

4. Should appellant's sentence be vacated?

## I. *PROCEDURAL BACKGROUND*

Lamont Hamwright, appellant, was convicted in the Circuit Court for Baltimore County of numerous serious felonies. All the felonies of which appellant was convicted occurred within a span of approximately two hours on the evening of November 30, 1999. The counts of the indictment, appellant's victim(s), and the prison sentences imposed by the trial judge, were as follows:

Count 10—victim (Jenny Scott)—kidnapping, 30 years imprisonment; Count 13—victim (Jenny Scott)—armed robbery, 20 years imprisonment; Count 15—victim (Jenny Scott)—use of a handgun in the commission of a crime of violence—20 years imprisonment; Count 17—victim (Kelvin Floyd)—carjacking—30 years imprisonment; Count 19—victim (Kelvin Floyd)—armed robbery—20 years imprisonment; Count 21—victim (Kelvin Floyd)—use of a handgun in the commission of a crime of violence—20 years imprisonment; Count 25—victim (Darryl Watson, a clerk at a Royal

---

**2.** Jurisdiction issues can be raised for the first time on appeal. Md. Rule 8-131(a).

Farms store located at Lutherville, Maryland)—armed robbery—20 years imprisonment; Count 29—victim (Darryl Watson)—use of a handgun in the commission of a crime of violence—20 years imprisonment; Count 31—victim (Violet Maina, a clerk at a Royal Farms store located in Baltimore County near the intersection of Joppa and Thornton Roads)—armed robbery—20 years imprisonment; Count 37—victim (Sara Irungu, a co-worker of Violet Maina)—armed robbery—20 years imprisonment; Count 41—victims (Ms. Maina and Ms. Irungu)—use of a handgun in the commission of a crime of violence—20 years imprisonment.

All of the above sentences were to run concurrently with the thirty year sentence imposed in regard to Count 17, except for the sentence imposed as to Count 10—which was to run consecutively to the sentence imposed in Count 17; the sentence imposed as to Count 10, however, was suspended in favor of five years active probation when appellant completes the executed portion of his sentence.

In this appeal, Hamwright does not contend that the evidence was insufficient to convict him of any of the crimes charged, nor does he contend that the lower court committed any error during the trial. He asserts that all the errors arose out of the lower court's mishandling of various pre-trial motions.

 Appellant admits that the circuit court had jurisdiction to try him for an attempted first-degree sexual offense as well as a first-degree sexual offense. This admission, however, cost him nothing because the jury acquitted him of the first-degree sexual offense charge, and at the end of the State's case, the attempted first-degree sexual offense charge was nol-prossed.[3]

---

3. The State correctly points out:

[I]t is clear that once a criminal court lawfully acquires jurisdiction over a juvenile and the subject matter of the litigation involving that juvenile, the court does not lose jurisdiction as a result of subsequent events or results of the trial. *Gray v. State*, 6 Md.App. 677, 682–85, 253 A.2d 395. *Accord In re Darren M.*, 358 Md. 104, 109–13, 747

To decide which, if any, of the eleven crimes of which appellant was convicted "arose out of the same incident" as either the first-degree sexual offense charge or the attempted first-degree sexual offense charge, it is necessary to outline the evidence presented by the State as to when, where, and under what circumstances each crime was committed.

To resolve the closely related question of whether the trial judge erred in failing to sever the case into several parts, it is important to also understand what evidence was utilized by the State to prove that appellant was the criminal agent who committed each of the eleven crimes.

## II. *APPELLANT'S CRIME SPREE*

### A. *Facts*

Kelvin Floyd ("Floyd") was chatting with his girlfriend, Jenny Scott, at 9:30 p.m. on November 30, 1999. The two were parked in Floyd's 1992 Honda Accord in front of Ms. Scott's Baltimore City apartment. Their conversation was interrupted when three youths, later identified by Floyd and Ms. Scott as appellant, Valentine Miller ("Miller"), and Medan Harold ("Harold"), approached the Honda. Miller pointed a gun at Floyd's head, whereupon Floyd and Ms. Scott got out of the vehicle. Ms. Scott was then shoved back into the Honda by one of the youths, and Floyd was ordered to run. He did so. Immediately thereafter, Floyd used his cell phone to call the police. Meanwhile, one of the three youths got behind the wheel of the Honda, and the other two jumped into the vehicle, which then sped off with Ms. Scott as an unwilling passenger.

The wheelman of the commandeered vehicle, taking a circuitous route, drove to the grounds of Spring Grove Hospital located in Baltimore County. While on route to the hospital,

A.2d 612 (2000); *State v. Coffield,* 17 Md.App. 305, 311, 301 A.2d 44 (1973).

Thus, the subsequent dispositions of the sex-offense charges do not affect the issue of whether the lower court had jurisdiction.

the three kidnappers threatened to kill Ms. Scott. They then robbed her of her checkbook and some jewelry.

Upon arrival at Spring Grove Hospital, the driver parked the Honda in a dark, secluded part of the hospital property. Everyone got out of the car, and two of the kidnappers attempted to rape Ms. Scott while a third (appellant) held a gun on her. Ms. Scott avoided being raped, however, by telling her abductors that it would not be in their best interest to rape her because she was ill. Ms. Scott was then forced, at gunpoint, to perform fellatio upon Harold and Miller—but not Hamwright. The three kidnappers next abandoned Ms. Scott, got into the Honda, and fled.

After their departure, Ms. Scott noticed that one of the youths had left behind a black glove. She kept the glove and later gave it to the police.

Appellant, Miller, and Harold used Floyd's Honda as transportation to a Royal Farms store located in Lutherville, Baltimore County, Maryland. The trio robbed the store. The victim of that robbery was Darryl Watson ("Watson"), a store clerk. The activities of the robbers at the store were captured on the store's videotape. As shown by the videotape, two of the robbers wore distinctive red and black jackets. Later, when Floyd and Ms. Scott were asked to describe the clothing of the three youths who carjacked the Honda, their descriptions matched the jackets worn by two of the armed robbers shown in the videotape.

Besides being captured on videotape, some of the robbers' activities at the store were witnessed by Thomas Champion, who saw "three men" pull up in a "dark Honda" as he was exiting the store. Mr. Champion could tell by their furtive behavior that a robbery was about to occur. Because of the trio's actions, he watched the store from a position across the street. Afterwards, he saw the robbers run from the store and drive away in the "dark Honda." Mr. Champion copied down the numbers "474," which were the last three digits on the Honda's Maryland license plate. He then called the police on his cell phone. Thereafter, he tailed the Honda as it made

its way toward another Royal Farms store. The second store was located near the intersection of Joppa and Thornton Roads in Baltimore County. Mr. Champion observed part of the robbery of that store. Two clerks were robbed at gunpoint by the same three youths. The victims were Violet Maina and Sara Irungu. The second robbery was also videotaped, and like the first, it showed the robbers wearing bandanna masks, which covered the robbers' faces below the eyes, and also showed two of the robbers wearing the aforementioned distinctive jackets.

After the second robbery, Mr. Champion shadowed the Honda for a time as it headed back to Baltimore City. He was close enough at one point to discern the first and last letters on the Honda's rear tag. He was unsure of the middle letter. Mr. Champion called the police again and gave them an update as to the Honda's tag number and its whereabouts. At trial, he positively identified Floyd's Honda as the one used in the two store robberies.

On the day following the robbery, in the early afternoon, Floyd's Honda was discovered by the Baltimore City police in an alley in Baltimore City. The police also found appellant, Harold, and Miller loitering nearby. One of the officers noticed that Harold was wearing only one black glove. A police officer inquired if any of the three had been in the Honda. Appellant replied that all three of them had been in the car looking for "loose change." The three were then arrested. Later that day, appellant's home and that of a co-defendant were searched, and jackets similar to ones shown in the aforementioned videotapes were seized.

On December 2, 1999, at 12:55 a.m., appellant gave a written statement to the police in which he admitted that he had participated in the carjacking of Floyd's vehicle and the robbery of the two Royal Farms stores. He also admitted being present when Ms. Scott was forced to perform fellatio on Harold and Miller.

DNA tests and semen stains found on Jenny Scott's sweatshirt identified Miller as the source of some of the semen.

Harold could not be included or excluded as the source; appellant was excluded as the source by the DNA testing.

## B. *The Jurisdictional Issue*

In *People v. Beyer*, 768 P.2d 746 (Colo.Ct.App.1988), the court was called upon to interpret a statute that required the imposition of consecutive sentences for persons convicted of "two separate crimes of violence arising out of the same incident...." *Id.* at 747. David Beyer was convicted of attempted first-degree murder, two counts of second-degree kidnapping, and a second-degree assault. *Id.* at 746. The question presented was whether each of the convictions arose out of the same incident. The *Beyer* court summarized the pertinent evidence as follows:

The charges against defendant arose from a series of events that began in an automotive repair shop in Colorado Springs. Ronald Aylesworth, accompanied by his friend Martin Newville, drove to the shop to settle a dispute over recent repairs made on Aylesworth's truck with Bradley Mitchell, the shop operator and codefendant here. Upon their arrival, Aylesworth and Newville were taken to the back of the shop where they found themselves surrounded by four armed men, including defendant and Mitchell. The victims were instructed to lie down on the floor, and when Aylesworth failed to comply defendant shot him. Both victims were then bound and placed in the back seat of Aylesworth's truck.

Defendant drove the truck to a remote mountainous area while Mitchell sat in the front passenger seat holding a gun. The victims were then ordered out of the truck, at which time Aylesworth collapsed as a result of his injuries. With the assistance of Newville, defendant began carrying Aylesworth down the mountain slope into a ravine while Mitchell held his own gun and defendant's gun. At some point the codefendants alternated and Mitchell carried Aylesworth while defendant held the guns. Newville was tied to a tree

at the bottom of the ravine and both victims were abandoned.

*Id.* at 747.

After a bench trial, the trial judge concluded that Beyer used or possessed and threatened the use of a gun in committing the attempted murder of Aylesworth (by abandoning Aylesworth while he was in a weakened condition) and three other offenses (two counts of kidnapping and one count charging second-degree assault). *Id.* The trial court ruled that, because all the crimes arose out of the same incident, Beyer was subject to mandatory consecutive sentences. *Id.*

On appeal, Beyer argued:

[T]he word "incident" as used in this statutory scheme is a term of limitation intended by the General Assembly to mean a single occurrence rather than a broader range of events. . . . [B]ecause the shooting of Aylesworth, the transporting of the victims to the mountains, and the abandonment were separate incidents as opposed to a single incident, the statute is inapplicable to the facts of this case.

*Id.*

The *Beyer* court disagreed and explained:

Contrary to defendant's contention, the word "incident" is not limited in meaning to a separate unit of experience, but is defined also as "an occurrence . . . . taking place as part of a larger continuum" or "a happening or related group of happenings" subordinate to a main plot. *Webster's Third New International Dictionary* 1142. *Hence, an incident may logically include a series of acts committed in close proximity or a chain of events forming a part of a schematic whole.*

We therefore conclude the meaning of the term "incident" as used in the statute is sufficiently broad to encompass the related crimes committed here as a single incident for sentencing purposes.

*Id.* at 747–48 (emphasis added).

In the case at hand, reading section 3–804(e)(1) in context, we believe that the General Assembly intended the

word "incident" to have the same definition as that utilized in
*Beyer* and set forth in *Webster's Third New International
Dictionary*,[4] which, when applied in the context of the lan-
guage set forth in section 3–804(e), means, "A series of acts
committed in close proximity or a chain of events forming a
part of a schematic whole."[5] *Beyer*, 768 P.2d at 748. Using
that definition, we shall first analyze, as a unit, the crimes
where Ms. Scott was the victim, i.e., kidnapping (Count 10),
armed robbery (Count 13), and use of a handgun in the
commission of a crime of violence (Count 15). As to those
crimes, appellant argues:

> [T]he kidnapping, armed robbery, and use of a handgun
> against Jenny Scott was a separate incident from the sexual
> offense incident. Jenny Scott was kidnapped at the time of
> the carjacking incident. The assailants forced her into
> Kelvin Floyd's car and abducted her. During the thirty or
> forty minutes that they drove her around, they threatened
> her and robbed her. After the assailants and Ms. Scott
> reached Spring Grove Hospital, they took her out of the car.
> The sexual offense incident then took place near a building
> on the grounds. Thus, it was a separate incident.

■ We disagree. The kidnapping of Ms. Scott was a
continuing offense. *Beatty v. State*, 56 Md.App. 627, 635, 468
A.2d 663 (1983). It started in Baltimore City when she was
forced into the Honda and lasted until she was abandoned in
Baltimore County on the grounds of Spring Grove State
Hospital. Because Ms. Scott was being kidnapped at the very
point when the sexual offenses occurred, there can be no
doubt that the kidnapping arose out of the same incident as
the sexual offenses.

---

4. In determining the meaning of a statute, we may consult the dictio-
nary. *Department of Assessments and Taxation v. Maryland–Nat'l Capi-
tal Park & Planning Comm'n*, 348 Md. 2, 14, 702 A.2d 690 (1997).

5. *Beyer, supra*, was the only case from any jurisdiction that we could
find interpreting the phrase "arose out of the same incident"; no case
was found using the phrase "arising out of the same incident."

■■ In regard to the armed robbery of Ms. Scott, it is true that the sexual offenses did not take place simultaneously with the armed robbery. Nevertheless, using the definition of "incident" as set forth *supra*, the sexual offenses and the armed robbery constituted "a series of acts committed in close proximity" to one another. Additionally, the crimes, like the sexual offenses, were acts in "a chain of events forming a part of a schematic whole." As for the handgun offense (Count 15), the handgun was used in the commission of all of the crimes involving Ms. Scott that we have just determined to have arisen out of the same incident as the sexual offenses. Therefore, the offense charged in Count 15 arose out of the same incident as the sexual offense.

We next turn to the question of whether the crimes of which Floyd was the victim arose out of the same incident as the first-degree sexual offenses committed against Ms. Scott. Appellant does not provide us with a definition of "incident" that he advocates, but he appears to contend that the sexual offenses were too removed in time from the carjacking for the two crimes to be considered "in close proximity" with one another. Appellant claims that thirty to forty minutes elapsed between the point where Floyd's car was carjacked and the point where Ms. Scott was forced to perform fellatio.

Appellant was convicted of three crimes where Floyd was the victim: carjacking (Count 17), armed robbery (Count 19), and use of a handgun in the commission of a crime of violence (Count 21). But the armed robbery was actually a lesser-included crime with the carjacking because the only item taken from Floyd by force was the Honda. In regard to the carjacking, the State proved that appellant and his two cohorts used a handgun to force Floyd to relinquish possession of his Honda Accord.

If we look at the crimes against Floyd from Ms. Scott's perspective, those crimes arose out of the same incident as the sexual offenses. Ms. Scott was kidnapped, robbed, and forced to perform sexual acts by the same persons who victimized Floyd; all the crimes committed against Ms. Scott involved at

least one of the same handguns used against Floyd; the car stolen from Floyd was used to take Ms. Scott to the place where the sexual offenses occurred. The sexual offenses and the carjacking were a "related group of happenings." *Webster's, supra,* at 1142. And, the carjacking and the sexual offenses occurred reasonably close in time (about forty minutes) to one another. From Ms. Scott's perspective, it is also fair to say that each of the crimes (against either her or Floyd) constituted a "chain of events forming a part of a schematic whole."

From the perspective of the criminal actors, all the crimes against Floyd and Scott took place during an "unbroken series of acts occurring in close proximity to one another"—thus fitting the definition of "incident" set forth in *Beyer.*

■ For the foregoing reasons, we hold that the lower court had jurisdiction to try appellant for carjacking (Count 17), armed robbery (Count 19), and use of a handgun in the commission of a crime of violence (Count 21), because all of those crimes arose out of the same incident as the sexual offenses.

■ We now segue to the issue of whether the various charges that were filed as a result of the armed robberies of the two Royal Farms stores arose out of the same incident as the two sexual offenses alleged to have been committed against Ms. Scott. The State contends that the robberies of the two stores (and related handgun offenses) did arise out of the same incident, because, purportedly, the store robberies "were part and parcel of an ongoing criminal enterprise, which began with the carjacking of Floyd's vehicle."

All the crimes with which appellant was charged had at least three things in common: the persons charged with the crimes were the same, the guns used were the same, and Floyd's Honda Accord was utilized to transport the criminal actors away from the crime scene. And, we agree with the State that the armed robberies of the two stores were an important part of appellant's November 30, 1999, crime spree. In that sense, the store robberies might be fairly described as

"part and parcel" of an "ongoing criminal enterprise." But whether a crime is part of an ongoing criminal enterprise is not the test. If it were, it would probably be satisfied if appellant and his cohorts used Floyd's Honda to rob the Royal Farms store two days after the sexual offenses—which would not satisfy the requirement that the crimes occur in "a chain of events in close proximity" to one another.

From the viewpoint of the victim of the sexual offenses, it is impossible to see how the store robberies can be said to have arisen out of the "same incident" as those sexual offenses. At the time the store robberies were committed, Ms. Scott had been released by the kidnappers. She had no personal knowledge as to what occurred at the Royal Farms stores and was in no way affected by those crimes. The crime spree lasted a total of two hours and five minutes (125 minutes). The sexual offenses apparently took place in the first thirty to forty minutes. But neither the exact time nor the approximate time that elapsed between the sexual offenses and the armed robberies of either the first or second store was established. If we utilize the definition set forth in *Beyer* and apply it from the perspective of the victim, the offenses cannot be said to be part of "a chain of events forming a part of a schematic whole."

Likewise, from the perspective of appellant and his cohorts, it cannot be said that the sexual offenses and the store robberies "were part of a schematic whole." Once the kidnappers abandoned Ms. Scott, the chain of acts between the sexual offenses and store robberies was broken.

Because of the problem of "proximity" and the fact that Ms. Scott was neither a witness to nor a victim of the store robberies, we hold that the two store robberies did not arise out of the same incident as the first-degree sexual offenses. Therefore, the circuit court did not have jurisdiction to try appellant for Counts 25, 29, 31, 37, and 41.

### III.

Appellant next argues that the trial court erred in denying his counsel's request for a severance. Appellant relies on

*McKnight v. State,* 280 Md. 604, 612, 375 A.2d 551 (1977), where the Court said that "a defendant charged with similar but unrelated offenses is entitled to a severance where he establishes that the evidence as to each individual offense would not be mutually admissible at separate trials." *See also Tichnell v. State,* 287 Md. 695, 415 A.2d 830 (1980); *State v. Jones,* 284 Md. 232, 395 A.2d 1182 (1979).

In the trial court, appellant's attorney asked that his client be given three separate trials: one trial for the armed robbery of the Royal Farms store located in Lutherville, Maryland; another trial for the robbery of the second Royal Farms located at the intersection of Joppa and Thornton Road; and a third trial for all other crimes, i.e., those where either Floyd or Ms. Scott were the victims. Therefore, insofar as it concerns the various charges for which we have held that the trial court did have jurisdiction, appellant did not contend that any of those charges should have been severed from each other.

Appellant, in a closely related and alternative argument, contends that his motion for severance should have been granted because the jury that considered the crimes of which either Floyd or Ms. Scott were the victims were impermissibly allowed to hear "other crimes evidence" concerning the store robberies.

At his trial, appellant denied his criminal agency as to all charges. He presented an alibi defense. Thus, the central hurdle the State had to surmount in order to convict appellant was to convince the jury that appellant was one of the three people who used a handgun to carjack Floyd's Honda (Counts 17, 19, and 21). If the State could prove appellant participated in the carjacking, appellant's alibi defense would crumble as to Counts 10, 13, and 15. This is true because the three persons who carjacked the Honda were indisputably the same as the three that kidnapped Ms. Scott. The question then becomes: Did proof that appellant robbed the two Royal Farms stores on the night of November 30, 1999, help prove that he was one of the three persons who stole the Honda at

gunpoint? If the answer to that question is "yes," the trial court did not err in admitting that "other crimes" evidence in the trial of the charges over which the court did have jurisdiction. *See* Md. Rule 5–404(b) (Evidence of other crimes, wrongs or act, is admissible to prove identity of criminal agent.).

Proof that appellant and his cohorts robbed the two Royal Farms stores was probative as to the identity of the persons who robbed and carjacked Floyd and robbed, sexually violated, and kidnapped Ms. Scott. Mr. Champion, at trial, unequivocally identified Floyd's Honda as the one used by the persons who robbed the Royal Farm stores. His identification was bolstered by his testimony concerning the license tag number he observed. If believed, Mr. Champion's testimony directly proved that Floyd's vehicle was used in the armed robberies of the Royal Farms stores. From the fact that Floyd's Honda was being used by the threesome twice in the eighty-five-minute (approximately) time period after Ms. Scott was abandoned, together with other evidence discussed, *infra,* the jury could infer properly that the group that robbed the two Royal Farms stores on the night of November 30, 1999, was, more likely than not, the same group that had carjacked Floyd's Honda. It would be unlikely, in the extreme, that the group that stole the car abandoned it after Ms. Scott was sexually assaulted and that thereafter three other persons used the car to commit two robberies in the next eighty-five to ninety-five minutes.

Appellant counters that neither Mr. Champion nor any of the Royal Farms clerks who were robbed could identify any of the three robbers. While true, this overlooks the fact that appellant confessed to robbing the two stores and stealing the Honda at gunpoint.

Moreover, in the unlikely event that the State elects to retry appellant for the two store robberies,[6] testimony as to the

---

6. As things now stand, appellant could be retried as a juvenile. If, however, the State were able to convince the juvenile court to waive

crimes committed against Floyd and Ms. Scott would be admissible. In view of the mode of dress of the criminal actors and the identity of the automobile used, it is highly probable that whoever carjacked Floyd's vehicle and kidnapped Ms. Scott were the same persons who committed the robberies.

The trial judge did not err in denying the severance requested.

## IV.

Prior to trial, appellant's counsel asked that all charges pending against his client be sent back to juvenile court (a "reverse waiver"). The motions judge denied that request, saying:

The Court has considered the five criteria that are required.[7] And although age and his amenability to treatment may in some way suggest that he be waived back to juvenile court, the issue of public safety, even though counsel wants the Court to ignore one, that cannot obviously be ignored. There is only one more serious crime that the [d]efendant could have been charged with on this particular evening.

And I hope he's exonerated. But if he's not, he was not acting as a juvenile on this particular evening. He was acting as an adult and should be punished as an adult.

The Court completely agrees with the waiver summary, that this is not a situation whereby this young man ought to be treated as a juvenile, but must be treated as an adult.

 Appellant stresses the fact that, in refusing the request for a "reverse waiver" back to the juvenile court, the motions judge placed primary emphasis on the seriousness of

---

jurisdiction, he could be retried as an adult. *See* art. 27, § 594A (quoted in note 1, *supra*). Because the appellant's sentences for the crimes over which the trial court did not have jurisdiction were concurrent with Count 17, retrial seems unlikely.

7. The five criteria are set forth in note 1, *supra*.

the charges and the issue of public safety. Appellant argues that if the motions judge had realized that jurisdiction over "most" of the charges already was in the juvenile court he may have granted the "reverse waiver" or deferred his decision to see what the juvenile court might do. The contention that "most" of the charges were already in the juvenile court assumes that the court did not have jurisdiction over any count other than the two alleging that appellant committed the sexual offenses. For reasons already explained, this is a false premise. Moreover, even if appellant's premise was correct, the argument was not made below and is therefore waived. *See* Md. Rule 8–131(a) (Except for jurisdictional issues, an issue neither raised nor decided below is ordinarily waived for appellate review purposes.).

Aside from the preservation issue, it is clear that the trial judge's decision would not have been different if he had known that the circuit court did not have jurisdiction over the crimes arising out of the two Royal Farms stores robberies. Remaining to be tried in the circuit court were two other armed robberies (of Floyd and Ms. Scott), together with a kidnapping charge and the two sexual offense charges. The public safety concerns would be just as grave whether the court had jurisdiction to try appellant for the armed robberies of the two stores or not. Moreover, four of the charges over which the court did have jurisdiction (carjacking, kidnapping, and the two sexual offenses) were more serious and carried a greater potential penalty than *any* of the charges over which the court did not have jurisdiction.

For these reasons, we hold that the trial judge did not err in denying the reverse waiver.

## V.

Appellant contends that the motions court erred by denying his motion to suppress the incriminating statement he gave to the police. He contends that the statement was involuntary and argues:

It was undisputed below that [a]ppellant was only fifteen years old and had a learning disability.

Detective [Williams] Vaseleros testified that [a]ppellant was detained at 1:00 p.m. on December 1, 1999. He was formally arrested an hour later and taken to the police station. He was handcuffed and placed in leg irons in the interrogation room.

Detective [Peter] Hanlan testified that he gave [a]ppellant *Miranda* advice at 5:30 p.m. Appellant testified that he did not receive any such advice. He did request an attorney. No attorney was provided for him.

Detective Hanlan testified that [a]ppellant made an exculpatory statement at 7:45 p.m. and an incriminating statement at 12:55 a.m. Thus, the police admitted that [a]ppellant was kept, chained and incommunicado, in an interrogation room from about 3 p.m. until about 1 a.m., a period of about ten hours. This was extreme duress on a fifteen year old child. The lengthy detention of [a]ppellant in the interrogation room made clear to him that the detectives would keep him there until he made a self-incriminating statement. Detective Hanlan testified that [a]ppellant was not given food or water during this detention.

As shown above, [a]ppellant's self-incriminating statement was improperly induced and coerced. It was involuntary under all the circumstances.

In sum, the lower [c]ourt erred by denying [a]ppellant's motion to suppress evidence. Appellant's conviction[s] should be reversed.

Detective Peter Hanlan testified that he read appellant his *Miranda* rights about 5:30 p.m. on December 1, 1999, and appellant waived those rights. Prior to his advice of rights, appellant had been in an interrogation room since about 4 p.m. Another detective confirmed that appellant was advised of his *Miranda* rights and elected to waive them.

Detective Hanlan testified that at all times during questioning, appellant was calm, quiet, and very cooperative. Detective Hanlan also testified that appellant's father was aware

that his son had been arrested. Appellant never asked for his parent, however, nor did he ask for an attorney or ask permission to phone anyone—according to police testimony. In fact, he did not ask for special attention of any kind. According to Detective Hanlan, during interrogation, appellant appeared remorseful, and wrote his statement himself without help.

Appellant's first written statement to the police was exculpatory. And, according to the testimony of the police officers who were present, after his first statement, appellant slept in the interrogation room. Appellant never asked for any food or water. After the police obtained the first statement, Floyd made a photographic identification of appellant as one of the persons who had stolen his car. Armed with this new information, Detective Hanlan then re-approached appellant and obtained from him a second written statement. The second statement was obtained about 12:25 a.m. on December 2. In this second statement, appellant admitted that he participated in the carjacking and the robberies of the two Royal Farms stores.

Appellant testified at the suppression hearing that he completed the ninth grade, and could read and write, but could do neither well. While in middle school, he was treated by the school psychologist for a learning disability. He was not, however, placed in any special education classes.

Appellant testified that he asked his police interrogators for permission to call his mother and an attorney, but permission was denied. He also said that no one told him that he had a right to remain silent or that he had the right to have an attorney present during interrogation. Appellant explained the incriminating contents of his written statement by saying that a detective told him exactly what to write. He also testified that he had never before been in an interrogation room and that he was "scared for his life" when he gave the incriminating statement.

In denying the suppression motion, the motions judge said:

It appears to me that Mr. Hamwright has some learning problems, that he said he finished the ninth grade. But if he had finished the ninth grade without some problems, I would think that he would have been able to better communicate in writing.

Although his ability to communicate verbally does not seem in any way to be impaired, he seems to understand and communicate. His writing is not to the level of what you would expect of someone who has a ninth grade education. Age 15 at the time.

There is no evidence of any drugs or alcohol. His own testimony was that it is not the case, that he was not under the influence of any drugs or alcohol. He did not—he does not appear today and did not suggest nor does any of the other evidence suggest that he was physically impaired.

He seems to have sufficient experience, although his formal education is lacking. I am persuaded that there was no mistreatment of [appellant by the police].

I'm further persuaded that there was no physical intimidation or psychological intimidation. I'm further persuaded that there were no promises or threats or other coercion measures implied [sic] and implied [sic] or used against Mr. Hamwright.

Under all of the circumstances I believe that the statements made were made freely and voluntarily. I'm persuaded that he was informed of his right to counsel, and that those items set forth on the State's Exhibit Number 3 [the *Miranda* rights waiver form] were made known to [appellant], and that he understood them and that he freely and voluntarily waived his right to counsel and he agreed to speak with the police.

So I find that as to the statements, that both are freely and voluntarily made and that they meet the requirements set forth in Miranda and that the motion with respect to the two statements is denied.

Appellant's confession was admissible at trial only if it was:

(1) voluntary under Maryland nonconstitutional law, (2) voluntary under the Due Process Clause of the Fourteenth Amendment of the United States Constitution and Article 22 of the Maryland Declaration of Rights, and (3) elicited in conformance with the mandates of *Miranda* ... [*v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)]. *Winder v. State*, 362 Md. 275, 305–06, 765 A.2d 97 (2001) (some citations omitted).

 In deciding whether his statement was voluntary, we analyze the facts by considering the totality of the circumstances. *Burch v. State*, 346 Md. 253, 266, 696 A.2d 443 (1997). The same is true even for a juvenile. *McIntyre v. State*, 309 Md. 607, 620, 526 A.2d 30 (1987); *Snowden v. State*, 76 Md.App. 738, 741, 548 A.2d 165 (1988).

Taking the suppression hearing evidence in the light most favorable to the State, as we must, *Riddick v. State*, 319 Md. 180, 183, 571 A.2d 1239 (1990) (quoting *Simpler v. State*, 318 Md. 311, 312, 568 A.2d 22 (1990)), appellant was advised of his *Miranda* rights and waived them.

 It is true, as appellant points out, that he was held in an interrogation room for approximately ten hours prior to giving an inculpatory statement and that during this period his movements were restricted by handcuffs and leg irons. But appellant was held "incommunicado" only in the sense that he did not have the benefit of the presence of his parents, a lawyer, or friends during interrogation. This did not, however, make the confession he gave involuntary under the circumstances of this case where appellant, according to the testimony that was believed by the motions judge, never asked for an attorney or made any other request that was not granted. The length of interrogation was not excessively prolonged. Interrogation did not start until 5:30 p.m., and there was a sleep break between the time the interrogation commenced and the time he gave his inculpatory statement at 12:37 a.m.

The motions judge did not err in rejecting appellant's contention that the incriminating statement he gave to the police was involuntary.

■■■■■■■■■■

## VI.

In *Gary v. State,* 341 Md. 513, 516, 671 A.2d 495 (1996), the Court said:

Only three grounds for appellate review of sentences are recognized in this state: (1) whether the sentence constitutes cruel and unusual punishment or violates other constitutional requirements; (2) whether the sentencing judge was motivated by ill-will, prejudice or other impermissible considerations; and (3) whether the sentence is within statutory limits. Gary does not contend that his sentence is unconstitutional, or that Judge Bothe was motivated by impermissible considerations. His sole contention is that his sentence exceeds a statutory limitation imposed by the legislature, and therefore is illegal.

Appellant contends that if we rule that the lower court did, in fact, have jurisdiction over one or more but not all of the crimes of which he was convicted, his sentence should be vacated because the lower court considered the invalid conviction in sentencing him for the valid conviction. According to appellant, this constituted "an impermissible consideration in sentencing."

We note, first of all, that in regard to the various convictions arising out of the robbery of the two stores, the trial judge imposed concurrent sentences, i.e., sentences that ran concurrent with the sentence imposed in Count 17—the carjacking count.

■■■ A sentencing judge "can take into account a wide, largely unlimited, range of factors" in deciding what sentence is appropriate. *Johnson v. State,* 274 Md. 536, 542, 336 A.2d 113 (1975). This broad discretion permits the trial judge to consider the facts and circumstances surrounding a charge of which the defendant was acquitted. *See Logan v. State,* 289 Md. 460, 481, 425 A.2d 632 (1981), where the Court said:

In considering what is proper punishment, it is now well-settled in this State that a judge is not limited to reviewing past conduct whose occurrence has been judicially established, but may view "reliable evidence of conduct which

may be opprobrious although not criminal, as well as details and circumstances of criminal conduct for which the person has not been tried." *Henry v. State,* 273 Md. 131, 147–48, 328 A.2d 293, 303 (1974). Indeed, since an acquittal does not necessarily establish the untruth of all evidence introduced at the trial of the defendant, the "sentencing judge also may properly consider reliable evidence concerning the details and circumstances surrounding a criminal charge of which a person has been acquitted." *Id.* This broad discretion to appraise multifarious information from multitudinous sources has for some time been recognized to be both a necessary and a desirable requisite to the prevalent modern penal philosophy of individualized punishment. *See Williams v. New York,* 337 U.S. 241, 247, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949).

*See also Henry v. State,* 273 Md. at 150, 328 A.2d 293.

 Even though the circuit court did not have jurisdiction over any charges connected with the two store robberies, it was in no way improper for the sentencing judge to consider the facts and circumstances surrounding those robberies in sentencing appellant for the crimes where Floyd and Ms. Scott were victims. *Logan, supra.* We therefore reject appellant's contention that the sentencing judge was motivated by improper considerations.

**JUDGMENT AS TO COUNTS 10, 13, 15, 17, 19, AND 21 AFFIRMED; JUDGMENT AS TO COUNTS 25, 29,31, 37, AND 41 REVERSED; COSTS TO BE PAID FIFTY PERCENT BY APPELLANT AND FIFTY PERCENT BY BALTIMORE COUNTY.**